DEWEY RAUCH, RESPONDENT, v. THE GAS SERVICE COMPANY and CARL JENKINS, APPELLANTS.—235 SW (2) 420.

Springfield Court of Appeals. Opinion delivered December 27, 1950.

*Mcreynolds, Flanigan & Flanigan, John H. Flanigan, Jr.,* and *Lawrence H. Flanigan,* Attorneys for Appellants.

978

*Jo B. Gardner*, Attorney for Respondent.

McDOWELL, J.—This is an action for slander. Suit was filed in Barry County, Missouri, later transferred, on change of venue, to the Circuit Court of Lawrence County, where on October 6th, 1949, it was tried by a jury, resulting in a judgment for plaintiff in the sum of $750.00 actual damages and $2500.00 punitive damages. Defendants appealed to this court.

The petition alleges that on April 27th, 1949, defendant Jenkins, acting in his capacity as agent for corporate defendant, in the presence of plaintiff and plaintiff's wife, willfully, wantonly and maliciously spoke of and concerning plaintiff certain false, defamatory and slanderous words, to wit: "I said that Dewey (meaning plaintiff) was a liar and a cheater;" "They (meaning the furnishing of gas service to the Edwards' home in Pierce City and the installation of a furnace for Josephine Kenney in Monett) were both crooked deals." The petition, likewise, alleges that, on the same occasion and in the presence of the same parties, defendant Jenkins said: "You (meaning plaintiff)

are a liar and a cheater, and you (meaning plaintiff) have never done your job (meaning for the defendant corporation), and you will have to eat a lot of crow up and down Broadway, (meaning the Main street in Monett, Missouri) from now on.''

The prayer of the petition was for $10,000.00 actual damages and $15,000.00 punitive damages.

In separate answers defendants denied the utterance of the alleged slanderous words and pleaded qualified privilege. The answers denied plaintiff had been damaged. No reply was filed.

At the close of plaintiff's case and at the close of all the evidence, defendants filed motions for directed verdict, which motions were, by the court, overruled.

The jury returned a verdict for plaintiff against both defendants for $4,000.00 actual damages and $8,000.00 punitive damages.

Defendants filed their motion for new trial October 17th, 1949. January 9th, 1950, the court rendered the following judgment on said motion:

''The verdict of the jury being excessive as to actual damages under the evidence, and for punitive damages so excessive as to indicate bias and prejudice against defendants, the defendant's motion for new trial is sustained unless within 10 days plaintiff enters a remittitur herein of $3,250.00 actual and $5,500.00 punitive damages, reducing the judgment for plaintiff to $750.00 actual and $2,500.00 punitive damages.''

Plaintiff accepted remittitur and the court, on January 17th, 1950, entered judgment for plaintiff for $750.00 actual damages and $2500.00 punitive damages. From this judgement defendants appealed.

Appellants rely upon two assignments of error for reversal in this case.

1. ''Plaintiff failed to make a submissible case,'' and

2. ''The verdict and judgment are excessive.''

In this opinion we will refer to respondent as plaintiff and to the appellants as defendants; where referring to the corporation we will use corporate defendant.

The evidence shows that plaintiff, at the time of the trial, was 52 years of age; had a high school and business college education; that he had sold gas appliances since August, 1925, and had been employed by the corporate defendant in Monett and elsewhere from said date until April, 1949. It was a part of his duty to create good will for the Gas Service Company, to promote the sale of gas fired appliances and eliminate use of competitive fuels. Defendant Jenkins became District Manager at Monett in 1946. It was his duty to supervise the employees in the Monett district, of whom, he, plaintiff, was one. Mr. Rosenkrans was Mr. Jenkins' superior in the New Business Department, which was plaintiff's department, with office in Kansas City. B. C. Adams was General Manager of the entire Gas Service Company with office in

Kansas City. When plaintiff dealt with Mr. Rosenkrans, he did so through Jenkins and his relations with Jenkins had not always been cordial.

To show malice on the part of Jenkins, plaintiff offered evidence of specific business transactions between himself and Jenkins. Plaintiff testified that there was in general effect for some eighteen months prior to the alleged defamation, a so-called dealer-cooperation plan under the terms of which it became the duty of plaintiff and other salesmen employed by corporate defendant, to cooperate with independent dealers in stimulating the sale of gas-fired appliances; that the primary concern of the gas service company was not selling appliances but selling gas. Plaintiff received a commission on certain appliances, which he sold for the gas company and, likewise, for the sale of appliances sold through dealers providing certain prerequisites were observed, to wit: the filing of a prospect card with corporate defendant and the purchase of a gas-fired appliance by the prospect within a stipulated time after the filing of the card. The principal dealers, operating under the cooperation plan, in plaintiff's territory were Mr. Worm, Mr. Bradley and Mr. Caudle. These dealers, likewise, sold electric heating equipment and butane-fired equipment. The gas company did not take trade-ins on appliance sales and, in those instances, where a prospective customer had a used appliance to trade in, the prospect was referred to a dealer and usually the dealers selling an appliance made the installation; that the gas company serviced appliances sold by both it and by dealers, except Mr. Worm liked to service his own appliances; that, at the end of a given monthly period, plaintiff would submit to the bookkeeper in the office of corporate defendant at Monett, a list of sales, whether company sales or dealer sales, on which he was claiming commission; that this list would be supplemented by a statement made by the dealers substantiating the fact that sales were made and verifying the installation of the equipment sold in the home or place of business of customer; the dealer was supposed to make out the monthly report of sales and installations, under the cooperation plan which was filed with defendant corporation and which was checked against plaintiff's claim for commissions in order to substantiate the same. The evidence shows that the dealers did not like to make out these reports and, ordinarily, plaintiff made them; that plaintiff's right to a commission on a given sale depended on the establishment of the facts, that plaintiff had filed a prospect card on the purchaser, within a limited time prior to making the sale; that a sale had been made to the prospect listed and that the appliance sold was one on which plaintiff was entitled to a commission. This information was derived from the prospect cards submitted by plaintiff and the list of sales submitted by the dealer.

The evidence shows that defendant Jenkins refused to pay plaintiff a commission on a sale of a gas-fired heater to one Burnett, on the ground that the appliance sold was not a gas-fired heater; that, after investigation, the commission was finally paid. This was a dealer's sale made through one, Buxton, a dealer in Pierce City; Jenkins questioned plaintiff's right to a commission on the Burnett sale because there was a question in his, Jenkins' mind, concerning whether the appliance sold was a gas appliance; he thought it was an electric appliance, under which sale plaintiff would not be entitled to a commission. Later, plaintiff obtained a statement from the dealer, Buxton, that the appliance was gas-fired, and the commission was paid. It is plaintiff's contention that the monthly reports made for the purpose of determining his rights to commissions should be accepted without auditing or questioning. Plaintiff testified this had always been done before. The evidence shows that the cooperation plan had been in effect only since the war or about eighteen months and, during this entire time, Jenkins had been the Division Supervisor of the department in which plaintiff worked.

Plaintiff testified that Jenkins criticized him for drinking coffee during business hours, stating that plaintiff spent too much time in the coffee shop.

Plaintiff testified concerning a Claude Edwards deal at Pierce City. This family was constructing a new home in Pierce City. Defendant Jenkins sent plaintiff to see them about a sale of a gas-fired furnace. Under plaintiff's employment he did not receive a commission on the sale of furnaces. Plaintiff, together with one, Balmas, foreman of the company's service department, checked a map of Pierce City to determine whether or not gas mains extended to the location of the Edwards home and came to the conclusion that the main was just across the street from the home. They so advised Edwards and sold and installed a gas furnace in the home. It was later discovered that the gas main was a block away from the Edwards home and, in order to connect the furnace installed with the gas line it was necessary to extend the line. Jenkins told plaintiff that he, plaintiff, had made a mistake in reading the city map, which was inexcusable. Plaintiff later rechecked the map of Pierce City and found that it was correct and that he had misread it. The evidence shows that, as a result of this mistake by plaintiff in misreading the map, the corporate defendant had been put to extra expense in order to extend the gas line so as to service the Edwards home; that the corporate defendant, in spite of the expense entailed in extending its mains, followed up the commitment which plaintiff had made and furnished the home with gas service. Plaintiff admits that it was Jenkins' duty as his immediate superior to criticize and correct plaintiff, but that he resented Jenkins' attitude concerning the transaction.

Plaintiff testified concerning a Josephine Kenney deal. Miss Kenney contacted plaintiff and advised him she wanted to heat with gas. Her home was old and the installation of gas in homes of that type was restricted unless a prospective customer had a doctor's certificate to the effect that gas heat was required in the interest of health of the prospect. Plaintiff advised Miss Kenney of the price of the furnace and got Mr. Caudle, a dealer, to give her an estimate on tin work necessary for the installation. Plaintiff submitted to Miss Kenney an estimate prepared by Mr. Caudle and explained to her that the cost of installation was a matter between her and Caudle. Mr. Caudle was in the sheet metal and furnace work business and installed, not only furnaces sold by him, but by other dealers, including the corporate defendant; that there was nothing on the estimate to indicate from whom Miss Kenney was buying the equipment and she had called the corporate defendant's office about it. Her first contact was with the plaintiff in the corporate defendant's office; that after the installation of the equipment, Miss Kenney came into the office of the corporate defendant to make a payment on the equipment; that plaintiff, being present then, advised Miss Kenney that the matter was between her and Mr. Caudle. Plaintiff testified he had previously told Miss Kenney that she was buying the furnace from Mr. Caudle. Plaintiff had been furnished with printed forms of receipts for cash, bearing the printed legend, ''Gas Service Company,'' which was the name of corporate defendant, with a line for signature underneath to be filled in by the employee; that the gas company had never instructed plaintiff not to use these receipts when collecting money for dealers; that the receipt recites that the signer has received cash; that the presumption attending the issuance of such a receipt would be that plaintiff was acting for the Gas Service Company, corporate defendant. Miss Kenney testified that she was not advised at any time that she was not buying the furnace in question from the Gas Service Company; that she went to the office of the Gas Service Company, in July, to make a payment on the furnace and did not discover until that time that the furnace had been purchased from Caudle; that plaintiff had never stated to her that the gas company was not selling the furnace; that plaintiff had stated to her that Caudle would do the tin work; that the furnace installed was one which was handled by corporate defendant.

Plaintiff stated that defendant Jenkins criticized him for leaving with Miss Kenney the impression that she had purchased her appliance from the Gas Service Company.

Plaintiff testified that Mr. and Mrs. Blankenship were in the furniture and appliance business in Monett; that they owned an electric power ice box and that Mrs. Blankenship wanted to buy a Servel gas refrigerator and trade in her ice box; that the gas company did not accept trade-ins; that by reason of the fact that Mr. Blankenship

was a dealer, plaintiff inquired of Jenkins if he, Jenkins, would allow the Blankenships a discount and Jenkins replied he would allow a discount but would not accept a trade-in; plaintiff referred the Blankenships to Mr. Bradley, a dealer; that the Blankenships determined that the discount offered by the gas company exceeded the trade-in allowance which Bradley offered them and that Bradley installed the equipment the following day. Plaintiff collected payments for the equipment in the form of a check payable to the corporate defendant, the Gas Service Company. Plaintiff took the check to Mrs. Mayer, the bookkeeper of the Gas Service Company, and had her endorse it to Mr. Bradley, whereupon plaintiff delivered the check to Bradley. Mrs. Mayer denied she endorsed the check. Plaintiff testified that he did not, in all instances where he made a sale for a dealer, advise the customers that they were purchasing from a dealer; that he sometimes purposely left them. with the impression that they were purchasing from the gas company.

The plaintiff was asked the following questions concerning a deposition he had given in this case:

"Q. Had you ever, prior to April 21, 1949, had any discussion with Mr. Jenkins concerning the issuance of Gas Service Company receipts for money which did not go to the Gas Company? A. No, sir."

Then the question was asked: "Q. Had you ever, prior to April 19, 1949, issued a Gas Service Company receipt for money which did not go to the Gas Company? A. Yes, sir.

"Q. Did you give that answer? A. I did.

"Q. On how many occasions? A. Well, that is too numerous to remember.

"Q. It was a matter of common practice? A. Yes, sir.

"Q. That was your testimony in June, wasn't it? A. I believe it was.

\* \* \*

"Q. You now say they weren't Gas Company receipts? A. I don't believe they were.

"Q. In June you said they were. A. May have been some."

Plaintiff testified that one, Pete Scott, was interested in the purchase of a Servel refrigerator and had an old piece of equipment which he desired to trade in; that Scott told plaintiff he did not like Bradley, the dealer. Plaintiff went to dealer Bradley, gave him a description of Scott's second hand box and determined what allowance Bradley was willing to make Scott on a trade-in. Bradley and the gas company were the only dealers handling that particular make of box which Scott wanted to buy and, since the gas company did not accept trade-ins plaintiff had to make the deal through Bradley. Bradley made

out a chattel mortgage and plaintiff procured Scott's signature to the same and collected the down payment. According to plaintiff, Scott did not know whether he was buying from the Gas Service Company or from Bradley. Plaintiff did not advise Scott he was buying from Bradley. According to plaintiff, Scott would not have purchased had he known that Bradley was selling the equipment. Plaintiff testified Scott signed the chattel mortgage. The duplicate and triplicate copies of the same were introduced as exhibits ''Q'' and ''O''. The original was exhibit ''R''. The triplicate copy, which was Scott's copy, bore no signature other than Scott's. The original bears the signature of A. D. Bradley for the Bradley Gas and Appliance Company as seller. Scott testified that the mortgage had not been signed by the seller at the time he signed it as mortgagor. Scott testified that he made payments on the mortgage to the First National Bank of Monett under the impression he had purchased the appliance from the Gas Service Company.

In plaintiff's deposition, taken June 23rd, 1949, the following testimony was given:

''Q. Was it your practice in those instances to advise the purchaser that the sale was not being made by The Gas Service Company? A. Yes, sir.

''Q. In every instance? A. No, sir.

''Q. Sometimes you did, and sometimes you didn't? A. Sometimes when I sold an appliance I would try to conceal it if they didn't care for the dealer, and I would pretend it was The Gas Service Company.

''Q. That is to say that you would issue a Gas Service Company receipt, leaving the impression with the customer that the appliance in question was being purchased from the Gas Company, when actually it was being purchased from a dealer? A. From a dealer.

''Q. And, as I get it, you did that on some occasions where competition was keen, knowingly and purposely concealing from the purchaser that the sale was being negotiated through the appliance company rather than The Gas Service Company? A. Yes, sir.''

Plaintiff testified concerning a business transaction with Luther Davidson. Davidson came to defendant corporation's office in Monett to purchase a large water heater and stated that he wanted to trade in a used piece of equipment. Plaintiff explained to Davidson that the gas company did not accept trade-ins and sent him to dealer Bradley; that at this particular time corporate defendant was paying a somewhat larger commission than usual on this type of equipment; that plaintiff tried to prevail upon Davidson to sell his trade-in equipment on the market, for cash, and purchase from the gas company, for cash, in order that he, plaintiff, might have the benefit

of the larger commission. According to plaintiff, Davidson stated he did not want to bother about selling his used equipment and would take the trade-in deal. Thereupon, according to plaintiff's testimony, he issued to Davidson a receipt for $71.36. This receipt was on a Gas Service Company form and bore the legend "Gas Service Company, by", and the signature "D. Rauch." Plaintiff testified that the gas company did not receive the money; that the deal was being made through Bradley and plaintiff was aware of the fact at the time of the signing and delivery of the receipt that the gas company would not receive any money.

Plaintiff testified that, shortly after these occurrences, on April 21st, 1949, defendant Jenkins called plaintiff by telephone, at his home, to come down to the gas company office ten minutes until twelve; that pursuant to the telephone call he reported immediately to the gas company office where Jenkins produced the receipt which plaintiff had given to Luther Davidson and said, "You gave Luther Davidson a receipt and the money is not in the drawer." According to plaintiff, Jenkins advised him at the time and place, (the conversation took place in the back of the gas company office in the warehouse) that he, Jenkins, had learned of the issuance of the receipt to Davidson when Davidson had come into the office, during plaintiff's absence, to make certain inquiries regarding the terms of payment set forth in the receipt. Jenkins then stated to plaintiff that he, Jenkins, had reported the matter to Kansas City; that Rosenkrans was out of town; that Jenkins had talked to Mr. Adams, the President of corporate defendant, who had directed Jenkins to obtain plaintiff's keys (inferentially to the Gas Company office in Monett) and suspend plaintiff, pending an investigation upon Mr. Rosenkrans' return; that, at the time, plaintiff invited Jenkins to go with him to interview Davidson, the two of them went to Davidson and, in defendant Jenkins' presence, plaintiff asked Davidson if he, plaintiff, had not explained to Davidson that the appliance was being purchased from Bradley, to which query Davidson responded, "No." Davidson testified that Rauch did not at any time advise him that the heater was being sold by the Bradley Appliance Company; that he first learned that Bradley had sold the appliance when Bradley came to his home to collect a payment on the same some ten days or two weeks after the installation. Davidson testified that if he had known he was purchasing from Bradley, he would not have made the deal because he did not feel that Bradley was reliable.

Plaintiff testified that after his conversation with Jenkins on April 21st, at which time Jenkins informed him of his suspension, plaintiff attempted to call Mr. Rosenkrans in Kansas City, by long distance telephone, and learned that he was out of town. He testified that on April 27th, defendant Jenkins called him by telephone, in the forenoon,

stating that he, Jenkins, had been to Kansas City, and asking plaintiff and plaintiff's wife to come down to the gas company office around the noon hour when the office was closed and no one was around and that he, Jenkins, would tell plaintiff the conditions under which plaintiff could return to work. Plaintiff stated that he did not accept the invitation; that he wanted to talk to Mr. Rosenkrans before talking to defendant Jenkins; that he did talk to Rosenkrans by telephone and Rosenkrans informed him that it was entirely up to defendant Jenkins upon what conditions plaintiff could return to work; that plaintiff's suspension had been lifted. Plaintiff and his wife then discussed the matter and decided that plaintiff should call Jenkins and make an appointment for a conference; that plaintiff called Jenkins and made an appointment for 8:00 o'clock P. M., April 27th, 1949, at the gas company office. At about 7:45, defendant Jenkins called plaintiff and said he could not meet plaintiff and his wife until ten minutes until nine of the same evening.

Plaintiff then detailed the conversation which took place in corporate defendant's office, the Gas Service Company at Monett, Missouri, 9:00 o'clock P. M., on the evening of April 27th, 1949, being the conversation on which the alleged slander is based. Plaintiff testified no one was present other than plaintiff, plaintiff's wife and defendant Jenkins; that Jenkins was seated at his desk in the north corner of the main office; that Jenkins invited plaintiff and his wife to come back and sit down. Jenkins said, "Dewey, you called Kansas City today didn't you?" Plaintiff replied: "Yes, sir, I did." Jenkins said: "That is going to make your job damn tough." Jenkins said: "You have never done your job and you are going to have to eat a lot of crow from now on going up and down the streets of Monett." Jenkins said to plaintiff's wife: "Edna, I want you to know the facts of this case, that Dewey is a liar and a cheater and it's going to have to be a different thing from now on." Plaintiff testified that Jenkins was angry and high strung; that his voice was above normal; that he struck the palm of his hand on the desk; that Mrs. Rauch said: "What did you say?" and Jenkins replied: "I said Dewey is a liar and a cheater." Mrs. Rauch said, "Did you say that?" and Jenkins replied, "Yes, I did." Plaintiff testified that Jenkins stated he wanted his wife to know the facts as a reason for wanting her to come down here.

Edna Rauch, wife of plaintiff, testified that she and plaintiff had been married 21 years; that she had formerly worked for the Gas Service Company; that she went with her husband on April 27th, to have a conference with defendant Jenkins. She gave this testimony: "When we first sat down, he said, 'Dewey, you called Kansas City today, didn't you?' ", and that her husband said, "Yes, I did." She testified that Jenkins said, "You made your job a lot tougher for

yourself." When asked the exact words, she said, "Dewey is going to have to eat a lot of crow up and down Broadway", and the witness said, "So are you." She testified that she asked Jenkins why he didn't give Dewey a chance to explain the transactions that had taken place before he called Kansas City, and that she meant the Davidson water heater deal. She stated that Jenkins told her that wasn't the first time that it had happened; that she asked him what about the Josephine Kenney deal and the Claude Edwards deal, and he said, "They were both crooked deals." She testified that Jenkins said he wanted her there so she would know the facts. "He said to me, 'Dewey is a cheater and a liar.' " She testified she was pretty mad and that when they started out she heard something said about Dewey's job being gone. She stated, "We were both mad." She said Jenkins came down on the the desk with his hand when he was talking. She testified that she understood the statements, made by Jenkins, to mean that plaintiff was taking money and using it for himself, the gas company's money or people's money. She testified that plaintiff had discussed with her the Josephine Kenney deal and the Luther Davidson deal and the Claude Edwards deal and she stated the first mention of the Kenney and Edwards deals was made by her. She also testified that at the meeting she asked Jenkins why he told Mr. Sheehan's wife the paper would come off their walls if she bought a clothes dryer and that when Jenkins denied making the statement she said to him, "Yes, you did." She testified that she wrote a letter to Mr. Koimn, an officer of the corporate defendant in order to try to get plaintiff's job back and sent in statements in the letter of citizens as to Dewey's good reputation. She stated, "I was in hopes we would get our job back and go to work." She testified she did not believe the statements made by Jenkins.

Plaintiff introduced Harry Singer, a Gas Service Company employee, working under Jenkins, who testified that Jenkins often came to his office to discuss company business; that on April 21st or 22nd, Jenkins did come to Singer's office and said, "I had to do something I sure hated to do, * * * I had to suspend Dewey," and when asked why, stated, "We have a receipt signed by Dewey that the money is not in the office." A. D. Bradley testified that Jenkins said to him on the 21st of April that he had done something he hated to do; that he had suspended Rauch and that Jenkins expressed regret at the necessity for taking that action.

We have adopted the above facts as stated in brief of defendants. We add certain additional facts from plaintiff's statement.

Plaintiff testified that Jenkins objected to commissions when he had a good month and not when he had a bad month; that he accused plaintiff of getting prospects from dealers when plaintiff had nothing to do with closing the deal for the purpose of illegally obtaining a commission. Plaintiff's witness Bradley testified, when asked if

plaintiff had secured the names of customers from him without finding them himself, first that he didn't understand the question and then he stated he did not give a list of his customers to plaintiff. Plaintiff's wife testified, when she told Rosenkrans about the slanderous remarks of Jenkins, he did not deny them, but she said Rosenkrans stated that he could not work with Jenkins. However, plaintiff's testimony also shows that he would not work with Jenkins and he had formerly tried to get a transfer from this division. She stated that Rosenkrans said she had no business at the meeting held between Jenkins and plaintiff, on the 27th of April.

Plaintiff's testimony was to the effect that Jenkins did not investigate the Kenney deal; that he knew Bradley sold the type of heater Davidson purchased, on the 21st, and made no attempt to get in touch with plaintiff before calling Kansas City. Plaintiff testified that he had told his wife about the troubles he was having with Jenkins before they went up there the night of the suspension; that he told her Rosenkrans had informed him, over the telephone, the suspension had been raised and that Jenkins would inform him upon what conditions he could return to work; that they had made an investigation and the company had suffered no financial loss and there was nothing dishonest about the deal.

Defendants' first assignment of error is that the plaintiff failed to make a submissible case.

In determining this question the court will accept plaintiff's evidence as true and, if there is substantial evidence to support the verdict, it must stand. Gust v. Montgomery Ward & Co., 229 Mo. App. 371, 80 S. W. 2d 286; Ford v. Louisville & N. R. Co., (Mo. Sup.) 196 S. W. 2d 163, 167; Young v. Wheelock (Mo. Sup.) 64 S. W. 2d 950; Perdue v. Montgomery Ward & Co. (Mo. Sup.) 107 S. W. 2d 12.

We find from plaintiff's evidence that the occasion of the publishing of the alleged slanderous words was one of qualified privilege and defendants could not be held liable in the absence of proof of express malice. In Gust v. Montgomery Ward & Co., supra, the law is stated:

"It is also held that the question is for the court in the first instance to determine whether or not the occasion was one of privilege. Wagner v. Scott, 164 Mo. 289, loc. cit. 302, 63 S. W. 1107; Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S. W. 100, 26 L. R. A. (N.S.) 1080." Banta v. Mitchell (Mo. App.) 226 S. W. 286; Garey v. Jackson, 197 Mo. App. 217, 193 S. W. 920, 923; Perdue v. Montgomery Ward & Co., supra.

The law is well stated in Gust v. Montgomery Ward & Co., supra, Loc. Cit. 290, as follows:

"The legal principles involved are well settled and will be referred to briefly. In 36 C. J. 1241, it is said that a qualified privilege is one which 'relates more particularly to private interests; and comprehends communications made in good faith, without actual malice,

with reasonable or probable grounds for believing them to be true, upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty.' Ordinarily, where defamatory words are published in regard to another, malice may be implied. But where the occasion is privileged, the presumption of malice is thereby rebutted and the burden is cast upon the plaintiff to prove express malice.''

In Garey v. Jackson, supra, the court said:

''The duty or interest on which the privilege is founded must actually exist, and it is not sufficient that the defendant honestly believes that such duty or interest exists. It is the surrounding circumstances as they appeared to the defendant at the time of the utterance of the words that the court considers in determining the question of privilege.''

Plaintiff's evidence shows that there had been objections to plaintiff's mode of selling gas-fired appliances for other dealers under a dealer's cooperative plan used by corporate defendant. Plaintiff admitted he had purposely misled purchasers, when buying from other dealers, to believe they were purchasing from corporate defendant. Plaintiff admitted that Jenkins, as District Manager, had a duty to determine the policies used by the company in making these sales and to direct him in the manner they should be made. Jenkins had criticized plaintiff in what is called the Edwards deal, wherein plaintiff had misread a city map, showing the location of corporate defendant's gas mains, and had sold and installed a gas-fired furnace. When defendant corporation undertook to connect the furnace, they found the gas main to be on a street a block away and were put to considerable extra expense in making the connection. Defendant Jenkins said this mistake was inexcusable. The Kenney deal is where the purchaser, likewise, was mislead by plaintiff in believing she had purchased a furnace from corporate defendant and Jenkins had criticized plaintiff for this deception.

Plaintiff's wife was fully acquainted with all the transactions wherein defendant Jenkins had criticized plaintiff for the manner in which he had made sales and had collected commissions. The very day, on which the alleged slanderous statements were made, plaintiff had been informed by Mr. Rosenkrans, a superior officer in the company to Jenkins, that plaintiff had been exonerated from any charge of dishonesty and his suspension had been lifted; that he would have to report to Jenkins and find out the conditions on which he could return to work. Plaintiff had communicated this to his wife before the conference. We, therefore, hold that the subject matter discussed between defendant Jenkins and plaintiff and his wife, at the time the alleged slanderous statements were made, necessarily called into dis-

cussion all of the criticisms of plaintiff's work which had been made by Jenkins, including the Edwards deal and the Kenney deal and, following the law laid down in Garey v. Jackson, supra, that it is the surrounding circumstances as they appear to the defendant at the time of utterance of the words that the court considers in determining the question of privilege, that these statements were privileged; that when the defendant uttered the words, "both deals were crooked", he uttered them in a sense that these deals were irregular and not in a sense of having a sinister and malicious meaning. All the parties were acquainted with the circumstances concerning these deals and there was nothing to lead them to believe otherwise.

The same condition existed when the words, "He is a liar and a cheater" were used. Corporate defendant had, just prior to this time, informed plaintiff that he had been exonerated from any charge of dishonesty and plaintiff had informed his wife what Rosenkrans had said, so they both knew that there wasn't any charge of dishonesty and they both knew that defendant Jenkins criticized plaintiff for leaving in the minds of customers of other dealers the wrong impression as to whom the seller was; that he had used the good will of the company in making sales for these dealers, which was not justified. Both plaintiff and his wife knew that plaintiff had collected money for other dealers, in the name of corporate defendant, and had given a receipt of corporate defendant, signed by himself as employer, which, directly misled and deceived the customers in believing that corporate defendant was the seller and it was to these transactions that Jenkins referred when he said that plaintiff was a liar and a cheater, and, we find that these statements did not constitute evidence of actual malice but were used in the sense of being irregular and against the policy of the company.

In Lee v. W. E. Fuetterer Battery & Supplies Co. et al., (Mo. Sup.) 23 S. W. 2d 45, 63, the law is stated:

"The word 'crooked,' as used in the defendant's testimony, does not necessarily have any sinister or malicious meaning, but was apparently used by the witness in his testimony in the sense and meaning of the word 'irregular.' "

We find the alleged slanderous words, used by defendant Jenkins, were not used with sinister or malicious meaning but in the sense that plaintiff's transactions had been irregular and against the policy of the company.

This meaning is further borne out by the fact that plaintiff testified that defendant Jenkins said he had never done his job. There can be no doubt that he used these words in the sense that he had never properly done his work because of the criticisms Jenkins had made against plaintiff's manner of making sales.

The more serious question presented to the court is, was there sub-

stantial evidence in the case to show actual or express malice in the publication of the alleged slanderous statements?

Actual or express malice is defined by Boehm v. Western Leather Clothing Co. et al., (Mo. App.) 161 S. W. 2d 710, 717, as follows:

"By actual or express malice is meant malice in fact as distinguished from implied malice, that is, the actual presence of an improper motive on the part of the defendant implying the purpose and desire to injure. It may, and in common acceptation does, denote that the defendant was actuated by spite or ill will towards the plaintiff, but in its legal significance such degree of personal hostility is not in all events essential. On the contrary, it is the willfulness or evil intent of the act— the wanton disregard of the rights and interests of the party injured —which suffices to render the act malicious in its legal sense; and hence the usual definition that by malice is meant the intentional doing of a wrongful act without just cause or excuse." 53 C. J. S. 36; Conrad v. Allis-Chalmers Manufacturing Co., 228 Mo. App. 817, 73 S. W. 2d 438, 446.

In Conrad v. Allis-Chalmers Manufacturing Co., supra, the law is stated:

"Qualified privilege, if found to exist, prima facie rebuts malice; and whether it does exist may, in the first instance, be a question for the court; but such presumption may be overcome by proof of express malice. Whether it is so overcome becomes a question for the jury. Wagner v. Scott, 164 Mo. 289, loc. cit. 301, 63 S. W. 1107."

We have held, in passing upon the question of qualified privilege, that the alleged defamatory statements were made by defendant Jenkins in the discharge of his duty, as an employee of corporate defendant, and that the words spoken were germane to the matters under investigation involving the interest of both corporate defendant and plaintiff and for the protection of both. We held that the words were uttered in good faith and on a proper occasion and from a proper motive based upon probable cause and in the honest belief that the statements were true. We held that the duty or interest on which the privileged statements were made actually existed. We hold that the alleged statements of slander in the petition did not constitute evidence of actual malice.

Plaintiff offered evidence to show that it was his duty to create good will for the Gas Service Company, corporate defendant, and to promote the sale of gas-fired appliances and eliminate the use of competitive fuel. He testified that defendant Jenkins' duty was to supervise the employees of the Monett District of which he was one. He testified that corporate defendant had a cooperative dealer's plan in which it became his duty, as salesman, to cooperate with independent dealers in the sale of gas-fired appliances. His testimony was that it was the principal concern of the Gas Service Company, corporate defendant, to sell gas and secondarily, gas-fired appliances.

Under plaintiff's evidence it was his duty to assist dealers in the sale of gas appliances and, for the last eighteen months, this cooperative plan had been used.

Plaintiff received a commission for selling gas appliances for corporate defendant and he received commissions under certain conditions, if he assisted other dealers in making such sales. He did not get a commission on furnaces.

Plaintiff testified that in order to secure a commission from dealer's sales, he first had to file a prospect purchaser's card with corporate defendant and then, if the sale was made by the dealer within a certain time and the appliance installed, he would be paid a commission at the end of the next month. Under this plan, the dealer filed a report with corporate defendant showing what sales had been made to purchasers secured by plaintiff and the date the appliance was installed. Defendant Jenkins checked the prospect card with the dealer's report to determine what commissions plaintiff was entitled to. Now plaintiff offered evidence to show actual malice on the part of Jenkins in the utterance of the alleged slanderous words; that he, Jenkins, refused plaintiff's commission on a sale of gas-fired heater to one, Burnett, on the ground that the appliance in question was not a gas-fired heater. This was a dealer's sale. The appliance sold had the same name that an electric appliance had and Jenkins questioned the commission because he thought the appliance was electric. Upon investigation with the dealer, it was found that the appliance was gas-fired and the commission was paid. Jenkins was merely carrying out his duty to his employer and, under no stretch of the imagination, could this be evidence of actual malice.

Plaintiff, however, testified he felt that his reports should be accepted without auditing or questioning. In this we think plaintiff did not understand his duties as salesman for corporate defendant.

Plaintiff offered evidence that Jenkins criticized him for spending too much time in the coffee shop during business hours. We cannot understand how this would show actual malice. It certainly was Jenkins' duty to see the employees were diligent in the performance of their work.

We have discussed the Claude Edwards deal and held that defendant Jenkins was merely carrying out his duty under his contract of employment.

Plaintiff offered evidence as to Josephine Kenney deal. Here, Miss Kenney came to corporate defendant's place of business to purchase a furnace. She met plaintiff in corporate defendant's place of business. Her house was old and required a health certificate in order to get the furnace installed. Plaintiff submitted an estimate of the cost for doing the tin work from a dealer, Caudle, who was in the

sheet metal and furnace work business, not only for himself but for corporate defendant and others. Caudle's name was printed on this cost estimate. Caudle sold and installed the furnace. Miss Kenney believed she was purchasing the furnace from corporate defendant and came to the office of corporate defendant to pay the installment thereon. This is the first case where defendant Jenkins criticized plaintiff for leaving, with the buyer, the impression that corporate defendant was the seller. Plaintiff admitted, in this sale, there was nothing in the cost estimate to inform Miss Kenney who the seller was. We hold that Jenkins had a duty to determine the manner that sales were made for other dealers and to instruct plaintiff not to use the good will of the corporate defendant in making such sales and that this was no evidence of actual malice. Defendant Jenkins was merely doing his duty under his position as employee of corporate defendant.

Plaintiff offered evidence concerning a sale of an electric-powered icebox to Mr. and Mrs. Blankenship. The buyers, here, wanted to trade in an old box on a new refrigerator. The corporate defendant did not accept trade-ins. Defendant Jenkins offered to allow a discount but would not accept a trade-in. The evidence shows that the Blankenships determined the discount offered was greater than the trade-in but the next day, a dealer, Bradley, installed the refrigerator. Plaintiff collected payment for the equipment by check made to corporate defendant. He testified he took the check to the bookkeeper, Mrs. Mayer, who endorsed it and plaintiff turned the check over to Bradley. Mrs. Mayer denied endorsing the check. The testimony is not clear for what purpose this offer was made.

Plaintiff offered testimony about the sale of a refrigerator to one, Pete Scott. He stated Scott had an old refrigerator and wanted a new Servel; that the company was not allowing trade-ins and he referred Scott to Bradley. He testified Scott was not friendly with Bradley; that he personally went to Bradley and found out what allowance he would make on the old refrigerator and then came back and made a deal with Scott. Bradley was the only other dealer who handled the Servel refrigerators besides corporate defendant. The evidence shows that Bradley made out a contract form but did not put his name on it; that plaintiff sold the refrigerator on time payment and collected the initial payment. Plaintiff testified that he didn't inform Scott who the seller was. Scott signed the chattel mortgage and the Gas Service Company's name, at the time, was not on the mortgage. Now, according to plaintiff, Scott didn't know that he was buying the appliance from Bradley, the dealer, and would not have purchased it if he had known Bradley was the seller. The chattel mortgages, in triplicate, were introduced in evidence and the copy left with Scott bore no signature, other than Scott's.

In this transaction plaintiff admits that he misled the buyer, Scott, in making the sale for Bradley and there is no question but what the testimony of plaintiff shows that Scott thought he was buying from corporate defendant. This does not constitute any evidence of actual malice. Jenkins was carrying out a duty he owed to corporate defendant in criticizing the transaction.

We, again, call attention to plaintiff's deposition, in which he testified that it was not his practice to advise the purchaser that the sale was not made by the Gas Service Company, corporate defendant. He gave this answer: "A. Sometimes when I sold an appliance I would try to conceal it if they didn't care for the dealer, and I would pretend it was the Gas Service Company." This question was asked: "Q. That is to say that you would issue a Gas Service Company receipt, leaving the impression with the customer that the appliance in question was being purchased from the Gas Company, when actually it was being purchased from a dealer? A. From a dealer.

"Q. And, as I get it, you did that on some occasions where competition was keen, knowingly and purposely concealing from the purchaser that the sale was being negotiated through the appliance company rather than The Gas Service Company? A. Yes, sir."

We discussed the evidence as to the Luther Davidson deal in passing upon the question of whether or not the alleged slanderous words were qualified communications.

This is the deal under which plaintiff was suspended from his job for collecting $71.36 and giving the company's receipt therefor, leading Davidson to believe he was buying from corporate defendant when, in fact, the deal had been made for a dealer named Bradley.

We call attention to the fact that the slanderous words relied upon did not cause the loss of plaintiff's job. Plaintiff had already been suspended on the 21st, some six days before the alleged slanderous words were spoken. By the greatest stretch of the imagination, one could not understand the acts of Jenkins in reporting this deal to his superior to be malicious or made with an intent to injure plaintiff in any manner. Plaintiff's conduct in making the sale was subject to criticism and Jenkins did his duty, as an employee of corporate defendant, in reporting the matter to his superiors.

Plaintiff offered in evidence, an employee of corporate defendant, who testified that Jenkins had said to him, "I had to do something I sure hated to do. I had to suspend Dewey;" and when asked the reason he stated, "We have a receipt signed by Dewey and the money is not in the office."

A. D. Bradley testified for plaintiff that on the 21st of April, 1949, defendant Jenkins had told him about the same words as were said to employee, Harry Singer.

These statements were made prior to the date of the alleged slanderous words. They were not slanderous and they were true, therefore, could not constitute evidence of actual malice.

Plaintiff testified that defendant Jenkins had accused him of getting prospect's names from dealers when plaintiff had nothing to do with closing the deal for the purpose of illegally obtaining a commission and that Mr. Rosenkrans had stated to plaintiff that he knew he could not work with Jenkins. The evidence developed on this matter shows that the dealers working under the cooperative plan, permitted plaintiff to make out their monthly reports, showing what sales plaintiff had assisted in and was entitled to a commission. Plaintiff's witness, Bradley, testified, when asked if he gave the names of prospective purchasers to plaintiff, first, that he did not understand the question and then said he did not give him a list of the names. Plaintiff admits that he did make out the reports for the dealers showing on what sales he was entitled to a commission. We hold this testimony shows, clearly, that if any criticisms were made, as claimed by plaintiff, they were justified. Plaintiff knew that the only way the company had in determining what commissions he was entitled to, was by comparing the prospect card he had filed with the report of the independent dealers, therefore, he was going beyond his line of duty in going to the dealers and making out their reports to the corporate defendant. We hold this was no evidence of actual malice.

Mr. Rosenkrans' statement that plaintiff could not work with Jenkins was induced by plaintiff's admissions that he was mad and told Rosenkrans that he could not work under Jenkins and asked to be transferred. Certainly, this evidence was not proof of malice on the part of Jenkins.

We think that plaintiff's evidence relative to defendant Jenkins' failure to investigate the Kenney deal and the Davidson deal and in his calling Kansas City, is clearly no evidence of malice. These infractions upon the policies of the company in carrying on its business about which defendant Jenkins was complaining to plaintiff, had been so numerous as to expel any belief that defendant Jenkins was actuated by malice.

We can hardly believe that it was the duty of Jenkins to be forced to investigate each transaction that plaintiff made in the sale of gas-fired equipment in order to prevent plaintiff from the continued practice of using the good will of corporate defendant in making sales for other dealers.

Plaintiff contends that the alleged slanderous remarks were made to his wife, who was not entirely familiar with his services rendered to corporate defendant and that that showed malice. With this contention we cannot agree. Plaintiff's evidence showed, beyond any

question of a doubt, that plaintiff's wife was familiar with every transaction involved, which was under discussion at the time the alleged slanderous words were uttered; that it was she who brought to the attention of defendant Jenkins, the Edwards deal, the Kenney deal and the Davidson deal, and she accused defendant Jenkins of having prevented another sale, showing her familiarity with all the difficulties that had arisen in connection with plaintiff's work and showing her hostility at the time against defendant Jenkins. The only evidence of malice in this case, if any, offered by plaintiff is that he resented Jenkins giving instructions as to how he could carry on his work. It looked like he was determined, where necessary to make sales, to deceive and mislead purchasers as to whom the seller was, using the good name of corporate defendant to secure business for other dealers, which conduct cannot be justified by this court. He did not want any supervision as to the correctness of his accounts and how could a jury say that defendant Jenkins, in checking the correctness of the accounts to determine the commissions due plaintiff, was evidence of malice. We hold there was no evidence upon which reasonable minds could differ, offered by plaintiff in this case to show actual malice.

The last question presented by defendants is that the damages are excessive.

In Harbison v. Chicago, R. I. & P. Ry. Co., (Mo. Sup.) 37 S. W. 2d 609, 616, the law is stated:

"Slander has been defined to be 'the speaking of base and defamatory words which tend to the prejudice of the reputation, office, trade, business or means of getting a living of another.' 36 C. J. p. 1146, Par. 4. 'Publication, in the law of defamation, is the communication of defamatory matter to a third person. Since the basis of an action for defamation is damages for the injury to character in the opinion of other men, in order to render defamation of any kind actionable, there must be a publication thereof.' "

This same case holds that there is no question but that words defamatory of the husband alone, spoken in the presence and hearing of his wife, would be a publication; that his wife would be a third person within the meaning of the law, she not being connected with the subject matter of the publication.

In Perdue v. Montgomery Ward & Company, supra, page 16, the law is stated:

"* * * 'It is not necessary, in order to recover general damages for words which are actionable per se, that the plaintiff should have suffered any actual or constructive pecuniary loss. In such action, the plaintiff is entitled to recover as general damages for the injury to his feelings which the libel of the defendant has caused and the

mental anguish or suffering which he had endured as a consequence thereof.' * * * 'The question of damages for a tort especially in a case of libel or slander is peculiarly within the province of the jury, and unless the damages are so unconscionable as to impress the court with its injustice, and thereby to induce the court to believe that the jury were actuated by prejudice, partiality, or corruption, it rarely interferes with the verdict.' ''

In Van Orman v. J. C. Penney Co., et al., (Mo. App.) 80 S. W. 2d 292, 293, the court states the law:

''Judge Ragland, speaking for our Supreme Court in the case of Seested v. Post Printing & Publishing Co., 326 Mo. 559, 31 S. W. (2d) 1045, at page 1054, in discussing compensatory and punitive damages, said: 'The award of punitive damages stands on a different footing: ''The giving of actual damages is not a matter of discretion, but one of absolute right, and such damages are required to be measured by standards that make them, as far as it is humanly possible, an exact equivalent in money of the injury suffered, while on the other hand, the giving or withholding of punitive damages, as well as the amount thereof, lies wholly within the discretion of the jury.' Grier v. Railway Co., 286 Mo. (523) 532, 542, 228 S. W. 454, 460. Unless therefore it plainly appears that there has been an abuse of such discretion, a court is not justified in interfering with an assessment of punitive damages.' ''

In this same case, the court said that the test usually applied is, whether the assessment is so excessive as to shock the judicial conscience.

We hold, in compliance with the law above set out, that $750.00 actual damages is excessive. The words alleged in plaintiff's petition which he claims were slanderous, are unambiguous and must be given their clear and common understanding. They do not impute the commission of a crime and are, therefore, not actionable per se. Jacobs v. Transcontinental & Western Air, Inc., et al., (Mo. Sup.) 216 S. W. 2d 523; McKim v. Moore, 291 Mo. 697, 237 S. W. 773; Atterbury v. Brink's Express Co., et al., (Mo. App.) 90 S. W. 2d 807.

In 53 C. J. S., page 364, par. 240, the law is stated:

''A publisher of a libel not defamatory on its face is liable only for the pecuniary damage which legally resulted from the publication.''

Plaintiff complained, in the evidence, of his humiliation caused by his discharge, among his friends. We have pointed out that this is general damage under circumstances where the action is slanderous per se and the damage is inferred from the utterance of the words. That is not the case here.

It is contended by defendants that the petition does not state a cause of action in that it did not allege special damages nor prove the same. They state that the only actual damage plaintiff could have sustained would have been damages to his profession or in the pursuit of his business or trade and they point out that, at the time of the alleged slander, plaintiff was not working. Be that as it may, there was no actual damage shown by the testimony in this case, and plaintiff was entitled to nominal damages, if any. Therefore, we find that the judgment for actual damages of $750.00 is excessive.

The question of the judgment for $2500.00, for punitive damages, under the law, raises a different question. Here courts are not passing upon the actual right of plaintiff to recover the damages he sustained in money but a question which is solely given to the discretion of the jury. Unless the judgment is such that shocks the conscience of the court, it should stand.

It is quite obvious that the trial court believed the judgment, both for actual and punitive damages, given by the jury was so unreasonable as to evidence prejudice or bias on the part of the jury. He required plaintiff to make a substantial remittitur. Plaintiff's evidence does not show malice or acts committed by defendants in reckless disregard of plaintiff's rights to justify $2500.00 judgment, punitive damages. This judgment is grossly excessive under the evidence and under the law as we have stated it.

Having found that there was no substantial evidence offered by plaintiff, in this case, to show actual malice, it is by the court ordered that the judgment of the trial court be reversed; that the cause be remanded with directions to enter a judgment for defendants. *Vandeventer, P. J.,* and *Blair, J.* concur.