Jimmy **SMITH**, Abe **Corley** and Joyce **Riley**, Respondents,

v.

**UAW–CIO FEDERAL CREDIT UNION, Appellant.**

WD 37477.

Missouri Court of Appeals, Western District.

April 21, 1987.

John M. Lilla, Kansas City, for appellant.

R. Britt Carlson, Kansas City, for respondents.

Before TURNAGE, P.J., and SHANGLER and KENNEDY, JJ.

KENNEDY, Judge.

Plaintiffs Smith, Corley and Riley each had a verdict against defendant UAW–CIO Federal Credit Union for actual damages ranging from $5,000 to $15,000 and punitive damages ranging from $1,000 to $2,000 for libel. From the ensuing judgment the credit union has appealed.

The facts are as follows:

The credit union is a federally chartered credit union. Its membership is composed of General Motors employees. It has offices near the General Motors plants at Leeds in Kansas City, Missouri, and at Fairfax in Kansas City, Kansas.

The overall government of the credit union is vested in a Board of Directors. The bylaws also provide for a "Credit Committee". The Credit Committee has the responsibility to approve or disapprove all applications for loans. No loan may be made by the credit union without the approval of the Credit Committee or of a loan officer to whom such authority has been delegated by the Credit Committee. The members of the Credit Committee receive no compensation except reimbursement for wages lost in attending meetings. They are elected by the members of the credit union.

In January, 1981, the members of the Credit Committee were the three plaintiffs and two other persons, John Lightner and C.F. Smith. At that time there developed a conflict between the Credit Committee on the one hand and, on the other hand, the Board of Directors, the Supervisory Committee and the office staff.

On September 11, 1981, the Board of Directors voted to remove the members of

the Credit Committee from office for the following reasons, as reflected in the minutes of the board meeting for that date:

"Motion by Daldrup to remove all of the Credit Committee members for cause from office, motion seconded by Mason. Reason—Forgering other member's signature, being intoxicated during meetings, taking material from credit union that wasn't supposed to be removed, making loans out of sequence with board policy, not following loan policy which was issued in writing by full board, making statement to Mason of the Board of Directors that the Credit Committee wouldn't follow the board policy, without every board member having signed it ...

The Credit Committee members were notified by letter of their removal, but the letter did not state the grounds therefor. Also a letter was written to Cumis Insurance Society, Inc., of Madison, Wisconsin, which had underwritten a fidelity bond, notifying it of the removal of the Credit Committee members. Neither did it specify the reasons for the Directors' action. Copies of the Cumis Insurance Society letter were sent to federal auditor Max Deakin, whose responsibility it was, as an employee of the National Credit Union Administration, to audit the credit union. The National Credit Union Administration had supervision over all federally chartered credit unions, including defendant credit union. A copy of the same letter was sent also to Mr. Corbin of the Supervisory Committee of the credit union.

The deputy regional director of Region V of the National Credit Union Administration headquartered at Dallas, Texas, Leon F. Handrick, wrote to Mr. Hughes, president of the credit union Board of Directors, expressing reservations about the removal of the Credit Committee members. The letter (dated October 9, 1981) concluded: "In order to monitor this situation, please contact this office by October 16, 1981, as to the specifics the Credit Committee members are charged with and future plans."

Handrick's letter prompted a meeting at the Credit Union offices on October 17 which proved to be highly important in the development of the case. Out of it came the letter, alleged by plaintiffs to have libelled them, which is copied into a later paragraph. The meeting was attended by the members of the Board of Directors; by four members of the Credit Committee, including the three plaintiffs and Mr. Lightner (the fifth member, Mr. Smith, had resigned before their removal on September 11 and did not attend the October 17 meeting); the members of the Supervisory Committee; and by Mr. Deakin, the auditor in the employ of the National Credit Union Administration. Mr. Deakin served as moderator. After an animated discussion, which will be discussed later in the opinion, Mr. Deakin recommended that the members of the Credit Committee be reinstated. This recommendation was taken under advisement by the Board of Directors, but was later rejected and the allegedly libellous letter was sent, dated October 19, 1981.

We copy the letter in full, underlining the portion alleged to be libellous:

Dear Mr. Leon F. Handrick:

I am writing you in reference to your letter dated 10–9–81. We used Article VII, Section 7 of the Federal Credit Union By-laws. *The Board charges, are as follows: 1. Forgering (sic) other member's signatures; 2. Being intoxicated during meetings; 3. Taking material from the Credit Union that wasn't supposed to be removed; 4. Making loans out of sequence with Board policy; 5. Not following loan policy which was issued in writing by full Board; 6. Making statement to one of the Board of Directors that the Credit Committee wouldn't follow the Board policy, without every Board member having signed it.* On October 17, 1981, Board of Directors met with the Credit Committee and the Supervisory Committee, Mr. Max Deakin served as moderator. The charges were explained to the Credit Committee. They stated charges were right with explanations. After hearing both sides of the discussion Mr. Deakin made a suggestion to the Board of Directors to reinstate four members of the Credit Committee to serve out their term

of office until the end of the fiscal year. The Board of Directors took the suggestion of Mr. Deakin under consideration and will make their decision at a later time.

Respectfully,

W.E. Scott, Acting Manager. Copies to B.E. Hughes and Max Deakin.

The letter or copies thereof were sent to all the persons indicated on the letter, namely, the National Credit Union Administration, Board of Directors Chairman B.E. Hughes and National Credit Union Administration Auditor Max Deakin. This is not disputed by the defendant credit union. There was also testimony that "the Board of Directors told" plaintiff Joyce Riley that a copy of the letter was sent to Cumis Insurance Society. It is this publication (to National Credit Union Administration, B.E. Hughes, Max Deakin and Cumis Insurance Society) which is the basis for one count of plaintiffs' petition, the count on which the verdict was for plaintiffs and which is before us on this appeal.

(Plaintiffs in another count of their petition claimed they were libelled when the letter was later read to a union membership meeting on January 31, 1982. The verdict was for the defendant on this count, and none of the plaintiffs has appealed.)

■ We should perhaps begin, in order to narrow the issues presented, by pointing out that defendant makes no argument here that the letter did not impute to each plaintiff individually the conduct which was the subject of the "charges used", nor does it make any claim that the imputations were not false.[1]

I

Defendant for its first point says that plaintiffs did not make a submissible case in that there was no evidence of damage to any of the plaintiffs. For that proposition defendant cites *Steckdaub v. Sparks*, 231 S.W.2d 160, 161 (Mo.1950); *Anderson v. Mutert*, 619 S.W.2d 941, 946 (Mo.App.1981); and *Rauch v. Gas Service Co.*, 241 Mo. App. 976, 235 S.W.2d 420 (1950), *overruled on other grounds*, *Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506, 511 (Mo. banc 1986). The first two cases are not defamation cases, but are personal injury cases. In those cases, of course, the plaintiff to make a submissible case must prove damages proximately caused by the defendant's fault. The third case, *Rauch v. Gas Service Co.*, recognizes the rule that slander which is actionable per se does not require proof of any actual or constructive pecuniary loss. 235 S.W.2d at 433.

■ A slander is actionable per se if it falsely imputes to the plaintiff the commission of a criminal offense; imputes to him a loathsome disease; imputes to him a matter incompatible with his business, trade, or profession or office; or imputes to him serious sexual misconduct. *Brown v. Kitterman*, 443 S.W.2d 146, 153 (Mo.1969); *Hunt v. Gerlemann*, 581 S.W.2d 913, 914 (Mo.App.1979); Restatement (Second) of Torts § 570 (1977). A libel, on the other hand, is actionable per se if it is on its face, without resort to extrinsic facts, injurious to the plaintiff's reputation. *Missouri Church of Scientology v. Adams*, 543 S.W.2d 776, 777 (Mo. banc 1976); *Anton v. St. Louis Suburban Newspapers, Inc.*, 598 S.W.2d 493, 496 (Mo.App.1980); R. Sack, Libel, Slander, & Related Problems § II.7.1 (1980). On the theory that a written statement which if spoken would constitute slander per se, would a fortiori constitute libel per se, the parties in their briefs have analyzed the offending letter by slander per se standards. We have adopted their approach.

Several Missouri cases apply the slander per se analysis to libel cases, and find libel per se if the same words spoken would

---

**1.** To be actionable, an allegedly defamatory statement must be of and concerning the plaintiff or plaintiffs. W. Prosser & W. Keeton, The Law of Torts, § 111 at 783 (5th ed. 1984). Where a specific defamatory statement is directed at a group small enough that its individual members are readily identified as those to whom the statement referred, a cause of action exists for each individual in the group. *Golden North Airways, Inc. v. Tanana Publishing Co.*, 218 F.2d 612, 618 (9th Cir.1954); *DeWitte v. Kearney & Trecker Corp.* 265 Wis. 132, 60 N.W.2d 748, 751 (1953); 50 Am.Jur.2d Libel & Slander § 312 (1970).

constitute slander per se. *See Buller v. Pulitzer Publishing Co.*, 684 S.W.2d 473 (Mo.App.1984); *Mitchell v. St. Louis Business Journal*, 689 S.W.2d 389 (Mo.App. 1985); *Hagler v. Democrat-News, Inc.*, 699 S.W.2d 96 (Mo.App.1985). As the court noted in *Henry v. Halliburton*, 690 S.W.2d 775 (Mo. banc 1985) at 779, "[m]odern law includes these causes of action (libel and slander) under the single tort of defamation, while retaining many of the common law characteristics of each."

■ Where a plaintiff alleges and proves defamation per se it is not required that he prove actual damages in order to make a submissible case. Damages are presumed. *Brown v. Kitterman*, 443 S.W.2d 146, 149, 153 (Mo.1969); *Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385, 388 (Mo. 1963). Defendant does not argue that the *amount* of actual or punitive damages are excessive.

■ In charging the plaintiffs with "forgering other member's signatures" defendant imputed to them the commission of a criminal offense. § 570.090, RSMo 1978. *See Barnett v. Schumacher*, 453 S.W.2d 934, 937 (Mo.1970) (imputing to plaintiff forgery of promissory note slanderous per se as charging commission of criminal offense); *Kelly v. General Telephone Co.*, 136 Cal.App.3d 278, 186 Cal.Rptr. 184, 186 (1982) (imputing to plaintiff forgery of invoices slanderous per se as charging commission of criminal offense); 53 C.J.S. Libel & Slander § 68 (1948). By charging them with "being intoxicated during meetings", it imputed to them conduct affecting their business, trade or calling. They were charged with being drunk at a time and on an occasion when they were supposed to be attending to business requiring the exercise of judgment and discretion. The rule is not confined to the vocation at which one works regularly for a living. "The rule also applies to offices held in private organizations such as labor unions, churches, fraternities, clubs and learned societies." Restatement (Second) of Torts § 573 b (1977). *See,* e.g., *Stoneking v. Briggs*, 245 Cal.App.2d 563, 62 Cal.Rptr. 249 (1967) *and DeWitte v. Kearney & Trecker Corp.*, 265

Wis. 132, 60 N.W.2d 748 (1953). The practice of being intoxicated at committee meetings would certainly tend to render a person unfit for membership on the Credit Committee (as shown by the removal of the Credit Committee members on that ground among others), and the false imputation of attendance at the meetings while in an intoxicated condition was actionable per se. *Welch v. Chicago Tribune Co.*, 34 Ill. App.3d 1046, 340 N.E.2d 539, 545 (1975); *Bloomfield v. Retail Credit Co.*, 14 Ill. App.3d 158, 302 N.E.2d 88, 98–99 (1973); 50 Am.Jur.2d Libel & Slander § 42 (1970).

II

Defendant's second point is that plaintiff failed to make a submissible case in that there was no evidence of defendant's actual malice in publishing the defamatory statements. Defendant is correct in saying that defendant's letter to Mr. Handrick in reply to his inquiry was protected by a qualified privilege, as a business communication to the agency which had the legal duty of supervision of the defendant credit union's affairs. *Henry v. Halliburton*, 690 S.W.2d 775, 780–81 (Mo. banc 1985); *Pulliam v. Bond*, 406 S.W.2d 635, 41 (Mo.1966). In such cases it is necessary for the plaintiff to prove, in order to recover, that the defamatory statement was made with actual malice. *Ramacciotti v. Zinn*, 550 S.W.2d 217, 225 (Mo.App.1977); *Estes v. Lawton-Byrne-Bruner Insurance Agency Co.*, 437 S.W.2d 685, 691 (Mo.App.1969).

■ Defendant's argument, however, assumes the wrong definition of actual malice in defamation cases. In defamation cases, actual malice does not mean, as defendant supposes, that defendant was actuated by spite, ill will and a purpose to injure the plaintiff. Actual malice, as that term is used in defamation cases, means the defendant's actual knowledge that the alleged defamatory statements were false or had a reckless disregard for whether they were true or false and had serious doubt as to whether they were true. That definition was adopted by the Supreme Court of the United States in a first amendment case, *New York Times Co. v. Sullivan*, 376 U.S.

254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but it has been adopted across the board in Missouri in defamation cases. Notes on Use, MAI 23.06(1) and 23.10(1). *Snodgrass v. Headco Industries, Inc.*, 640 S.W.2d 147 (Mo.App.1982); *Biermann v. Pulitzer Publishing Co.*, 627 S.W.2d 87, 88 (Mo. App.1981).

As to the imputation of "being intoxicated during meetings" it is clear that the members of the Board of Directors knew at the time of writing the October 19 letter that this statement was false as to these plaintiffs. Defendant makes no claim to the contrary. A former member of the Credit Committee was known to have had a "drinking problem" and one can gather from this record that he had perhaps shown up at one or more of the meetings under the influence of intoxicants. He however had resigned before the Board of Directors removed the other members by its action of September 11, 1981.

As to the "forgering other member's signatures", the members of the Credit Committee were confronted in the October 17 meeting with a document containing the purported signature of one J.W. Carter, terminating payroll deductions. This document had been signed by plaintiff Corley at Carter's request to effect the termination of payroll deductions. Plaintiff Joyce Riley, testifying about the October 17 meeting, said of the document: "It wasn't any money involved or anything involved. He [Carter] just wanted to stop the payroll deduction." Corley had a letter from Carter authorizing him to sign his name. Whether this was exhibited to the Board of Directors at the October 17 conference is not clear. At any rate, there was never any suggestion that plaintiff Jimmy Smith or plaintiff Joyce Riley had anything to do with signing the Carter card and Corley's explanation to the Board of Directors was sufficient to acquit him of any charge of forgery. There was sufficient evidence in this record to justify the jury in believing that the Board of Directors knew perfectly well that none of the plaintiffs had been intoxicated at any Credit Committee meeting and that none of them had been guilty of forgery. The fact is, the defendant here does not dispute that the Board of Directors knew the facts and knew that the imputations of intoxication and of forgery were false with respect to these plaintiffs, but argues here only that the defamatory statements were not made out of ill will, spite and with a purpose to injure plaintiffs.

### III

Defendant then suggests one other point at which the evidence falls short of making a submissible case. It says that the statements alleged by plaintiffs to be defamatory were expressions of opinion and therefore not actionable. It cites *Henry v. Halliburton*, 690 S.W.2d 775 (Mo. banc 1985). The statement in that case which was alleged to have defamed the plaintiff, there held to have been non-actionable expressions of opinion, were of a much different character than the statements made in the present case. In that case, the defendant had written in an article in a trade association news letter that "a certain insurance agent and general agent had acted with 'greed' for the purpose of 'fleecing a consumer for their [the agent's] own personal gain,' and that said general agent was a fraud and a twister". 690 S.W.2d at 778. The statement complained of appeared after a factual account of an insurance agent's going to an insured and inducing him to replace three life insurance policies with an insurance policy he was selling. The article had stated as fact that the agent had told the customer that it would be better for him; that the agent had left no "comparison form" at the time of the sale; that the application contained no affirmative answer as to the replacement of existing insurance; and that he had made no effort to conserve existing insurance. The court concluded that the words alleged by the plaintiff to have been defamatory were "the author's opinion based upon the recited facts and his premise that replacing Whole Life Par with Whole Life Non-Par is bad for the consumer." *Id.* at 789. The following language of the opinion is instructive:

Considering these words in light of all relevant circumstances, we believe that they are the author's opinion that one who does the described acts that the author deems objectionable is greedy, fleeces his customers and is a fraud and a twister (a term having uncomplimentary implications in the insurance industry). It is clear from the context of these words that respondent is not charging the commission of any specific crime, and "broad, unfocused, wholly subjective comment[s]" that do not suggest to the ordinary reader that the plaintiff committed a crime are not actionable. The law is well-settled that individuals may use pejorative or vituperative language when referring to another as long as they do not suggest specific criminal conduct, which would be a statement of fact.

*Id.* at 790 (quoting *Lewis v. Time, Inc.*, 710 F.2d 549, 554 (9th Cir.1983)).

■ In the present case by contrast the charge is of specific, defined conduct. It is not couched in terms of opinion based upon described fact premises. It stated that the Board of Directors had taken the drastic step of removing all the members of the Credit Committee, the plaintiffs included, on the grounds mentioned. A reader could only believe that the charges had been established. The letter went ahead to say: "The charges were explained to the Credit Committee. They stated charges were right with explanations." In the totality of the circumstances these statements are far removed from mere expressions of non-actionable opinion.

We have now taken up all the points at which defendant claims that plaintiffs fail to make a submissible case.

### IV

■ Defendant makes one additional point, however. It claims it is entitled to a new trial for error in giving the verdict-directing instructions. The instructions required the jury to find that "any one of such statements were read by the National

Credit Union Administration, B.E. Hughes, Max Deakin and Cumis Insurance Society, Inc."

Defendant does not claim that the evidence does not support a finding of publication to the National Credit Union Administration and to Max Deakin. It argues, though, that there is no evidence that the letter was received, read and understood by Cumis Insurance Society, Inc., and it argues that the sending of a carbon copy of the letter to B.E. Hughes, Chairman of the Board of Directors which directed the sending of the letter, does not constitute a publication to a third person. A defamatory statement to be actionable must be communicated to someone other than the plaintiff and the speaker (or writer) himself. *Jones v. Pinkerton's, Inc.*, 700 S.W.2d 456, 458 (Mo.App.1985); *Tucker v. Delmar Cleaners, Inc.*, 637 S.W.2d 222, 224 (Mo.App.1982). It argues also that the copy of the letter sent to Mr. Deakin, the employee of the National Credit Union Administration who was specifically charged with the supervision of the credit union, did not constitute a publication separate from the publication to the National Credit Union Administration itself. Defendant goes ahead to argue that since, as it contends, there was no publication to B.E. Hughes, Max Deakin or Cumis Insurance Society, the instruction was erroneous, even though there was admittedly publication to National Credit Union Administration. We do not decide whether there was publication to Hughes, to Deakin or to the Cumis Insurance Society. We rule the point on another basis.

Defendant cites MAI 1.02 [2] and *Knepper v. Bollinger*, 421 S.W.2d 796, 800 (Mo.App. 1967). The *Knepper* case does hold, as defendant contends, that the meaning of MAI 1.02 is that each fact submitted in an instruction, though in the conjunctive, must be supported by evidence. We take it that the rule of *Knepper v. Bollinger* no longer obtains since *Fowler v. Park Corp.*, 673 S.W.2d 749 (Mo. banc 1984), which reaf-

**2.** MAI 1.02 literally *prohibits* conjunctive submissions whether the disparate hypothesizations are supported by evidence or not. Defendant

does not complain, though, on the basis that the court gave a conjunctive submission in violation of the MAI proscription.

firms the rule of *Corley v. Kroger Grocery & Baking Co.*, 355 Mo. 4, 193 S.W.2d 897, 900 (1946). In *Corley*, the plaintiff's verdict-directing instruction submitted several charges of negligence in the conjunctive. It was held that where there was substantial evidence supporting one or more, but not all of the conjunctives, the giving of the instruction was not reversible error.

We hold that evidence of publication to the National Credit Union Administration supports the giving of the instruction, even if, according to defendant's contention, the evidence did not support the submission of publication to the other three persons named conjunctively with the National Credit Union Administration. The plaintiffs simply assumed a greater burden than they were required to carry.

Having ruled all the points raised in appellant's brief, we affirm the judgment.

All concur.