Lydia BALDERREE, Respondent,

v.

Betty BEEMAN and Lake Ozark Council of Local Governments, Appellants.

No. 17697.

Missouri Court of Appeals, Southern District, Division One.

Aug. 3, 1992.

Peggy D. Richardson, Stockard, Andereck, Hauck, Sharp and Evans, Jefferson City, for appellants.

Frank M. Evans, III, Cynthia B. McGinnis, Miller & Sanford, P.C., Springfield, for respondent.

CROW, Judge.

Plaintiff, Lydia Balderree, filed a slander suit against two defendants: Betty Beeman and an entity identified in the petition as "Lake Ozark Council of Local Governments."[1] For convenience, we henceforth refer to the latter defendant as "LOCLG."

Trial by jury produced a judgment in favor of Plaintiff for (a) $250 actual damages against both defendants, (b) $7,500 punitive damages against Beeman, and (c) $2,500 punitive damages against LOCLG. Both defendants appeal.

The villainously difficult issues require an account of the evidence. In summarizing it we adhere to the venerable axiom that inasmuch as the verdicts and judgment were in favor of Plaintiff, we view the evidence in the light most favorable to her, giving her the benefit of all reasonable inferences therefrom. *Haswell v. Liberty Mutual Insurance Co.*, 557 S.W.2d 628, 633[1] (Mo. banc 1977).

LOCLG is a regional planning commission created per the State and Regional Planning and Community Development Act. Laws of Missouri 1965, 2d Ex.Sess., S.C.S.S.B. 14, pp. 908–16, now codified as §§ 251.150–.440, RSMo 1986. Its region comprises five counties: Camden, Laclede, Miller, Morgan and Pulaski. At all pertinent times, Beeman was Executive Director of LOCLG.

Two other entities are enmeshed in this saga: Missouri Ozarks Community Action, Inc. ("MOCA"), and Central Ozarks Private Industry Council ("PIC").

MOCA is characterized in the record as a "community action agency" operating programs and services to enable low income people to become self-sufficient.

Plaintiff was hired by MOCA in 1983 and was soon promoted to "job developer." She explained:

> [The] individuals [served by MOCA] were determined to have some type of barrier to employment—either a financial barrier, a mental or physical disability, sometimes we worked with veterans.... As a job developer, my responsibilities were to go out in the communities, to talk to employers, to explain the various program functions that we ran, and to encourage them to utilize those programs so that we would have placement for the individuals that we worked with.

In 1988, LOCLG and MOCA had contracts with PIC regarding the Job Training Partnership Act ("JTPA"), 29 U.S.C.A. §§ 1501–1781. While few details of the agreements appear in the record, we gather from the testimony that MOCA was a "program operator" for PIC for some JTPA programs. MOCA would determine whether an unemployed person met JTPA eligibility requirements and, if so, would seek employment for such person with an employer participating in the program.

---

1. The bylaws of this entity state its name is "Lake of the Ozarks Council of Local Governments." No issue is raised in this appeal about the discrepancy.

LOCLG was the "administrative entity" for PIC. Explaining that relationship, Beeman testified JTPA funds came from the State to LOCLG "on behalf of" PIC. LOCLG prepared the required documentation, ensured that requests for funds met all guidelines, and filed written reports with PIC and the Division of Job Development and Training of the State of Missouri.[2] According to Beeman, this was "a major amount of paper work." LOCLG obtained information needed for the reports from MOCA.

On June 23, 1988, Beeman held a meeting at her office in Camdenton regarding a $70,000 request by MOCA to operate the "Summer Youth Employment Program." According to Beeman, five people were present: she; Charles Theodore Dirks, Jr., Interim Executive Director of MOCA; Wando Moore, Presiding Commissioner of Laclede County and Chairman of the LOCLG board; Katherine Kelsey, a member of PIC; and William G. McGarity, also a PIC member.

Describing the purpose of the meeting, Beeman testified MOCA had requested the $70,000 on June 6, and she "had asked for backup documentation for verification of the need of the check." She added, "When you're dealing with cash requests in the amount of $70,000 that you don't have verification on and when that's taxpayers' money, it is a major problem."

Dirks, testifying at trial as a witness for Plaintiff, recalled a discussion about MOCA employees toward the end of the meeting. His testimony:

Q. ... Defendant, Betty Beeman, say anything to you with respect to Lydia Balderree?

A. The subject that we were discussing ... was a rumor ... that some of the PIC members wanted certain MOCA employees terminated. One of the employees' names was Lydia Balderree.

Q. And did Betty Beeman say anything with respect to Lydia Balderree during that meeting?

A. At that time she said that the reason probably they wanted Lydia terminated was that she had propositioned some of the PIC members.

. . . .

Q. And did she identify any of those PIC members who Lydia had allegedly propositioned?

A. Yes. One she identified that I'm certain of is Bob Garnett. She identified another one and ... I can't recall exactly who it was. There were two PIC members that I was having some difficulty at that time keeping their names straight....

Q. And who were those two PIC members?

A. Ray Cassidy and Bob Douglas.... I'm not certain which of those two were named.

Q. ... do you recall who was present other than Betty Beeman and yourself ... when Betty Beeman made this statement to you?

A. As best as I recall, there were a couple of other people there still from the original group. I believe Commissioner Moore was still there and one other person, but I'm not absolutely sure of that.

. . . .

Q. Did Betty Beeman explain what she meant by "proposition"?

A. No.

Q. What did you think she meant?

A. I thought she meant a sexual proposition.

Q. And why did you think that?

A. I really couldn't imagine any other proposition that anyone could make to a person that would want them to be fired from their job.

Two or three weeks later Dirks learned Plaintiff was planning to attend a meeting of elected officials. Dirks realized some PIC members would be there. Dirks testified, "I felt that I owed ... it to her and the agency to warn her to be careful about

---

**2.** Additional information about JTPA and the State agency's role appears in the *Official Manu-* *al,* State of Missouri, 1991–1992, pp. 309–11.

what she said to any of the PIC members so that, if she did say anything, it couldn't be misconstrued." In warning Plaintiff, Dirks told her what Beeman had said. Plaintiff appeared startled and upset.

Plaintiff testified she was stunned and almost speechless at Dirks' disclosure. Then, said Plaintiff, she began to cry.

Plaintiff's immediate supervisor, James T. Haley, saw her a few minutes after her conversation with Dirks. Haley described Plaintiff as "shrunken and pale and shaking uncontrollably and crying."

Plaintiff went home, and did not attend the meeting.

At trial, Plaintiff testified she had met Bob Garnett once, being introduced to him at a PIC meeting. She had no conversation with him. Plaintiff testified she had likewise met Ray Cassidy only once, also at a PIC meeting. They had a brief conversation about Cassidy having lost his business. Plaintiff gave him a MOCA application form to see whether he would be eligible for one of the programs.

Donald Robert Garnett—presumably the "Bob Garnett" referred to by Dirks and Plaintiff—testified he was either vice president or secretary of PIC in 1988. He met Plaintiff only once prior to this suit.[3] Garnett avowed Plaintiff "never did proposition" him, and he never told Beeman she did.

Garnett also testified that on March 27, 1988 (three months before the June 23 meeting where Beeman made the statements about Plaintiff to Dirks), Beeman told him (Garnett) that Plaintiff "had propositioned Ray Cassidy." Garnett quoted Beeman as saying the incident occurred at a meeting at "Camdenton Vo–Tech School." Garnett had been present at that meeting. He testified:

> There were several of us standing in a group and [Ray Cassidy] walked up to us and said, "I've just been propositioned." Someone else said, "Lucky you." And someone else said, "By whom?"

Q. And what did he say?

A. And he said, "By that girl right back there."

Q. Did he identify by her name?

A. He identified her as Lydia Balderree.

Q. Did he say what kind of proposition it was?

A. From his tone of voice, it was not a job. There was shock and amazement in his voice, I think.

. . . .

Q. Did Ray say anything that would indicate that it was sexual in nature?

. . . .

A. He might have said, "I'm too old for that kind of thing" or something like that. I don't remember for sure. . . . Somebody else might have said, "You're too old for that kind of thing." It might not have been Ray.

Charles Ray Cassidy—presumably the "Ray Cassidy" referred to by Dirks, Plaintiff and Garnett—testified he had been a PIC board member from its inception and had held several PIC offices. Asked whether he would recognize Plaintiff, he replied: "I don't know. I doubt it very much ... I don't know what the woman looks like right now and ... [i]f she walked in and I looked at her, I might be able to say yes; but as of now, no." Cassidy recalled no conversations with Plaintiff, and did not remember mentioning Plaintiff's name in a conversation. Cassidy did not recall telling Beeman or anyone else that Plaintiff had "sexually propositioned" him.

Maxine L. Leather testified she was an LOCLG employee from September, 1985, until December, 1987. She described a conversation with Beeman that occurred in the fall of 1987 at the LOCLG office. Leather's testimony:

> [Beeman] said that one of the [MOCA] employees had propositioned two of the PIC members, and I asked who the [MOCA] employee was, and she said it was Lydia Balderree. And I asked who the PIC members were, and she said

**3.** Plaintiff filed this suit February 2, 1989.

[they] were Bob Garnett and Ray Cassidy.

. . . .

Q. Did you ever hear Betty Beeman tell anyone else that Lydia Balderree had propositioned someone?

A. Yes. I was present at a PIC meeting, and we were standing towards the back of the room at Zeno's in Rolla, and Betty was talking to some of the PIC members, two or three of them, and she was relating the incident that she said had taken place.

Q. Did she use the same words that you described earlier that she made to you with respect to the propositioning?

A. Yes, she did.

. . . .

Q. And ... when did that meeting occur?

A. The fall of '87 after the incident in the office.

Plaintiff testified Leather never told her about Leather's conversation with Beeman in the fall of 1987, and Garnett never told her about his conversation with Beeman on March 27, 1988. Plaintiff learned of these conversations when Leather's and Garnett's depositions were taken.

At trial, Beeman denied telling Dirks on June 23, 1988, that Plaintiff had propositioned a PIC member, denied telling Garnett on March 27, 1988, that Plaintiff had propositioned a PIC member, and denied telling Leather that Plaintiff had propositioned a PIC member.

Three of those present at the June 23, 1988, meeting at Beeman's office—Moore, Kelsey and McGarity—testified they did not hear Beeman say anything about Plaintiff that date.

Other evidence in the 351-page transcript will be summarized where pertinent to the various assignments of error.

■ The first of Defendants' eight points relied on avers LOCLG "is a public entity not subject to tort liability for slander under the doctrine of sovereign immunity and there was not sufficient evidence that [LOCLG] waived its sovereign immunity."

Section 537.600, RSMo 1986,[4] reads:

1. Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances:

(1) Injuries directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment;

(2) Injuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition. . . .

2. The express waiver of sovereign immunity in the instances specified in subdivisions (1) and (2) of subsection 1 of this section are absolute waivers of sovereign immunity in all cases within such situations whether or not the public entity was functioning in a governmental or proprietary capacity and whether or not the public entity is covered by a liability insurance for tort.

---

4. Section 537.600, RSMo 1986, was in effect on each of the dates the alleged slander occurred. It was amended in 1989 by the addition of three subsections, numbered 3 through 5. Laws of Missouri 1989, S.S. No. 2 S.C.S.H.C.S.H.B. 161, pp. 1078–80. The new subsections are immaterial here. Subsections 1 and 2, quoted above, were unchanged by the 1989 legislation.

Obviously, our first task is to determine whether LOCLG is a public entity. If it is, § 537.600 cloaks it with sovereign immunity from slander liability (unless, as argued by Plaintiff, LOCLG waived such immunity by purchasing insurance).

Creation of regional planning commissions is authorized by § 251.160.2, RSMo 1986. Such commissions are created by order of the Governor upon petition by the governing body of a local governmental unit (a city, village, town or county, § 251.-160.1(3)). In some circumstances, a public hearing on the petition is required. In designating the boundaries of the commission's jurisdiction, the statute requires consideration of "topographic and geographic conformations, extent of urban development, the existence of special or acute agricultural, forestry, conservation or other rural problems, uniformity of social or economic interests and values, park and recreational needs, civil defense, or the existence of physical, social and economic problems of a regional character."

From state funds appropriated by the General Assembly, § 251.036, the Governor may authorize the Department of Economic Development to make annual payments to regional planning commissions, § 251.032, on a matching basis of one-half state funds for one-half local funds, § 251.034. Any portion of such state or local funds may be used to qualify for matching federal funds. § 251.036.

The membership composition of a regional planning commission shall be in accordance with resolutions approved by the governing bodies of the local governmental units in the region. § 251.250.1. Regional planning commissions shall include the state representatives and state senators of the region. § 251.038.

LOCLG's bylaws, as we comprehend them, provide its business shall be transacted by an eleven-member executive committee. Of that number, nine are elected officials of the local governmental units, one is not an elected official, and one is a representative of minority organizations in the region.

A regional planning commission must keep a record of its resolutions, transactions, findings and determinations, which shall be a public record. § 251.270. A regional planning commission has the function and duty of making and adopting a comprehensive plan for the development of the region. § 251.320. All public officials shall, upon request, furnish the regional planning commission such available information as it requires for its work. § 251.-300. The regional planning commission shall make an annual report of its activities to the legislative bodies of the local governmental units within the region, to members of the General Assembly elected from districts lying wholly or partially within the region, and to the Department of Economic Development. § 251.310. When a regional comprehensive plan has been adopted, any local governmental unit must refer to the regional planning commission, for its consideration and report, the location of or acquisition of land for any facility included in the regional comprehensive plan. § 251.360.1. To provide funds for expenses of a regional planning commission, the commission shall annually prepare and approve a budget reflecting the costs of its operations and services to the local governmental units within the region; the amount charged to each unit shall be in the proportion that its assessed valuation bears to the total, or such other method as may be agreed upon by the governmental units within the region. § 251.400.

In *State ex rel. Regional Justice Information Service Commission v. Saitz*, 798 S.W.2d 705 (Mo. banc 1990), the major issue was whether an agency ("REJIS") maintaining a regional data base of criminal arrests and dispositions for the purpose of promoting efficient law enforcement and administration of criminal justice was a public entity within the meaning of § 537.-600, RSMo 1986, and thereby protected by sovereign immunity. REJIS, a joint commission established by ordinances of the City of St. Louis and St. Louis County, was funded by federal grants and user fees paid by authorized units of state and local government. In holding REJIS enjoyed sovereign immunity, the Supreme Court of

Missouri noted law enforcement and administration of criminal justice are within the exclusive police power of the State, and efficient performance of such functions is essential to the health, welfare and safety of all. *Id.* at 707. REJIS' status as a sovereign entity was not impaired by reason of its being sustained in part by user fees. *Id.* at 708[5].

In an earlier case, the Supreme Court of Missouri held a hospital district organized under chapter 206, RSMo, is shielded by sovereign immunity. *State ex rel. New Liberty Hospital Dist. v. Pratt,* 687 S.W.2d 184 (Mo. banc 1985). The hospital was therefore immune from tort liability for negligence in treatment of a hospital patient. The opinion stated: "... it is immaterial that the potential plaintiff was a paying patient.... The governmental character of operating a hospital does not evaporate if the public entity charges for its services." *Id.* at 186[4].

Among other entities protected by sovereign immunity are a municipal housing authority, *State ex rel. St. Louis Housing Authority v. Gaertner,* 695 S.W.2d 460 (Mo. banc 1985); a metropolitan sewer district, *Page v. Metropolitan St. Louis Sewer Dist.,* 377 S.W.2d 348 (Mo.1964); and a special road district, *Lamar v. Bolivar Special Road Dist.,* 201 S.W. 890 (Mo. 1918).

As reported earlier, regional planning commissions are authorized by §§ 251.150–.440, RSMo 1986. For the purpose of those sections, the term "political subdivision" means "... regional ... planning commissions and any other local public body ... exercising governmental functions." § 251.020(6), RSMo 1986. The definition implies a regional planning commission is a political subdivision of the state exercising governmental functions.

We hold LOCLG is a public entity within the meaning of that term in § 537.600, RSMo 1986, and is consequently immune from slander liability to Plaintiff unless, as discussed *infra,* LOCLG waived immunity by purchasing insurance.

Some of the factors leading us to this conclusion are: regional planning commissions are created by order of the Governor upon petition by the governing body of a local governmental unit; such commissions are funded by state funds appropriated by the General Assembly, together with federal funds and funds of local governmental units; such commissions must include state legislators of the region; nine members of LOCLG's eleven-member executive committee are elected officials; a regional planning commission's records are public records; all public officials are required to furnish the commission in their region, upon request, available information needed for its work; such commissions must make annual reports to the local governmental units, to local legislators and to the Department of Economic Development; and when a regional comprehensive plan has been adopted, local governmental units must inform such commission of the location of or acquisition of land for any facility included in the regional comprehensive plan.

By statute, regional planning shall include public water systems; storm water drainage and flood control systems; sanitary sewerage systems; integrated transportation systems; orderly land-use arrangements for residential, commercial, industrial and public purposes; local and regional governmental services coordinated with federal governmental services; solid waste disposal systems or facilities; educational facilities; open space, park and recreational areas; improved standards of community aesthetics and facilities design; general living conditions and environmental health; community health and hospital needs and related facilities; and coordination of planning activities for all federal assistance and grant-in-aid programs requiring comprehensive planning as prerequisites for eligibility. § 251.180. Those systems, facilities and programs, like the services provided by REJIS, enhance public health, welfare and safety.

We have not ignored Plaintiff's argument that, by statute, regional planning commissions are "solely advisory to the local governments and local government officials comprising the region." § 251.-300. We fail to see how that enfeebles

LOCLG's status as a public entity. REJIS exercised no governmental power, it merely collected information from, and supplied it to, units of government. REJIS was nonetheless held to enjoy sovereign immunity. *Saitz*, 798 S.W.2d at 707.

We likewise find no merit in Plaintiff's argument that LOCLG cannot be a public entity because it may accept gifts and grants from private individuals or agencies if the conditions under which such grants are made are in accordance with the accomplishment of the objectives of LOCLG. § 251.390. The hospital district in *Pratt*, 687 S.W.2d 184, was not solely dependent on public funds; it charged patients for its services. That did not destroy its sovereign immunity.

LOCLG is funded by the public treasury. Sovereign immunity guards such resources from depletion by tort claims, which could impair government's ability to carry out its duties. *See: Payne v. County of Jackson*, 484 S.W.2d 483, 485–86 (Mo.1972). As succinctly put in *Berek v. Metropolitan Dade County*, 396 So.2d 756, 758[1] (Fla.App. 1981), "The doctrine of sovereign immunity rests on two public policy considerations: the protection of the public against profligate encroachments on the public treasury ... and the need for the orderly administration of government, which, in the absence of immunity, would be disrupted if the state could be sued at the instance of every citizen."

Plaintiff also argues that by acting as an "administrative agency" for implementation of JTPA programs, LOCLG "stepped beyond its advisory capacity" and thereby ceased to be a public entity. We disagree. A regional planning commission is authorized by statute to act as a coordinating agency for programs and activities of local governmental units and other public and private agencies as they relate to its objectives. § 251.300.

Finally, we have studied *Stacy v. Truman Medical Center*, 836 S.W.2d 911 (Mo. banc 1992), decided after the instant case was argued and submitted. *Stacy* involved a "chapter 355 not-for-profit corporation, which [was] not controlled by or answerable to public officials, public entities or the public itself." *Stacy*, 836 S.W.2d at 921. LOCLG bears no resemblance to the entity in *Stacy*. Moreover, the three tests spelled out there for determining whether an entity is a public entity, 836 S.W.2d at 919–920, strengthen our conclusion that LOCLG is one.

■ Having found LOCLG is a public entity, § 537.600, and thus immune from slander liability, we must next determine whether LOCLG waived such immunity by purchasing insurance.

Section 537.610, RSMo 1986,[5] reads:

1. The ... governing body of each political subdivision of this state ... may purchase liability insurance for tort claims made against ... the political subdivision, but the maximum amount of such coverage ... shall not exceed one hundred thousand dollars for any one person in a single accident or occurrence, except for those claims governed by ... the Missouri workers' compensation law ... and no amount in excess of the above limits shall be awarded.... Sovereign immunity for the state of Missouri and its political subdivisions is waived only to the maximum amount of and only for the purposes covered by such policy of insurance purchased pursuant to the provisions of this section....

2. The liability of the state and its public entities on claims within the scope of sections 537.600 to 537.650 ... shall not exceed one hundred thousand dollars for any one person in a single accident or occurrence, except for those claims governed by ... the Missouri workers' compensation law....

3. No award for damages on any claim against a public entity within the scope of sections 537.600 to 537.650, shall include punitive or exemplary damages.

....

---

5. Section 537.610, RSMo 1986, was in effect on each of the dates the alleged slander occurred. It was amended in 1989 by the legislation identi-

fied in footnote 4, *supra*. The changes are immaterial here.

By their response to Plaintiff's request for admissions, Defendants admitted an insurance policy issued by Auto–Owners Insurance Company to LOCLG was in effect from January 1, 1987, to June 11, 1990. However, in their answer to Plaintiff's petition, Defendants denied Plaintiff's averment that the policy "affords coverage against plaintiff's claim."

Defendants' argument, as we grasp it, begins with the premise that the General Assembly has, by § 537.600, RSMo 1986 (quoted earlier) declared sovereign immunity is waived in only the two instances described in subdivisions "(1)" and "(2)" of subsection 1. That is, for injuries directly resulting from negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment, and injuries caused by a dangerous condition of a public entity's property.

Plaintiff maintains subsection 1 of § 537.610, RSMo 1986 (also quoted earlier), authorizes the governing body of a public entity to purchase liability insurance for tort claims against such entity and provides that sovereign immunity is waived as to any tort covered by such policy, up to the amount of the coverage. In Plaintiff's words, "[T]he legislature intended that the waiver language in § 537.610 provide an independent basis of waiver of sovereign immunity." Thus, says Plaintiff, sovereign immunity is waived not only in the two instances specified by subdivisions "(1)" and "(2)" of subsection 1 of § 537.600, but also in any instance where the public entity has, pursuant to § 537.610, purchased liability insurance covering a tort claim, up to the amount of the coverage and subject to the monetary limits in § 537.610.1 and .2.

The most recent guidance from the Supreme Court of Missouri on this subject appears in *State ex rel. Cass Medical Center v. Mason*, 796 S.W.2d 621 (Mo. banc 1990). There, a county hospital (cloaked with sovereign immunity per § 537.600.1) purchased liability insurance covering claims against its employees who were not shielded by official immunity. The insurance policy stated the insurer would pay "all sums which the insured shall become legally obligated to pay as damages." A party filed a wrongful death claim against the hospital, alleging medical negligence caused the death of his spouse. The claimant insisted the hospital had waived its sovereign immunity by purchasing the insurance. Rejecting that contention, the Supreme Court held:

> The insurance contract in this case ... never promised coverage of the kind of claim made [here]. The [hospital] was never "legally obligated to pay" because its liability falls under the sovereign immunity of section 537.600.1. Because [the] negligence claim does not fall under "the purposes covered by [the] policy of insurance," no coverage exists under this policy for the claim and no waiver of sovereign immunity exists under the language of section 537.610.1.
>
> Statutory provisions that waive sovereign immunity must be strictly construed.

796 S.W.2d at 623.

The Supreme Court recognized that § 537.610 provides an independent basis for waiving sovereign immunity, i.e., where the public entity purchases insurance covering a type of claim other than described in § 537.600.1(1) and (2). However, said the Court, "In this case, the unambiguous, circumscribed, insurance coverage of claims outside the protection of sovereign immunity created no waiver of the [hospital's] immunity." 796 S.W.2d at 624.

Here, the insurance policy issued to LOCLG provided, in pertinent part:

A. COVERAGES

1. .... We will pay those sums that the insured becomes legally obligated to pay as damages.... No other obligation or liability to pay sums ... is covered unless explicitly provided for....

....

C. WHO IS AN INSURED

1. If you are designated in the Declarations as:

....

c. An organization other than a partnership or joint venture, you are

an insured. Your executive officers ... are insureds, but only with respect to their duties as your officers....

Interrogatories by Plaintiff to Beeman contained this:

15. Was there any liability insurance policy affording coverage to you as an agent for [LOCLG] for liability which you may be exposed to as a result of the incident described in the petition? If so:

(a) Give the name of the company providing such coverage.

(b) Set forth the effective dates of the policy.

(c) State the amount of liability protection afforded.

(d) Attach a copy of said policy to your answers to these interrogatories.
ANSWER: Copy attached

16. Is any insurance company participating in the defense of this lawsuit under a reservation of rights letter or agreement? If so:

(a) Answer subparagraphs (a) through (d) of the preceding interrogatory with respect to each such company.

(b) Attach copies of all letters or other written documents evidencing said reservation to your answers to these interrogatories.
ANSWER: Copy attached

Beeman filed a supplemental answer to interrogatory 16; it was, "No."

Plaintiff contends Beeman's answers to the above interrogatories demonstrate LOCLG had a policy of liability insurance covering it against Plaintiff's slander claim, hence LOCLG waived sovereign immunity concerning such claim.

We disagree. The interrogatories were directed to, and answered by, Beeman in her capacity as an individual defendant. They were not directed to LOCLG and answered for it by Beeman as its agent. *See:* Rule 57.01(a).[6] Beeman may have believed that inasmuch as she was an executive officer of LOCLG, the policy provided her coverage as an "insured" against Plaintiff's claim (see paragraph C.1.c of the poli-

cy, quoted above) irrespective of whether LOCLG's purchase of the policy waived LOCLG's sovereign immunity. Whether such a belief is correct need not be decided here.

What must be decided is whether LOCLG, by purchasing the insurance, waived its sovereign immunity against Plaintiff's claim. On that issue, we follow *Cass Medical Center,* 796 S.W.2d 621. LOCLG's policy, like the policy there, obligated the insurer to pay sums the insured becomes legally obligated to pay.

As a public entity, LOCLG is sovereignly immune from tort liability except in the circumstances specified by § 537.600.1(1) and (2). Slander is not among those circumstances.

We find nothing in the insurance policy obligating the insurer to pay, on behalf of LOCLG, any sum other than that which LOCLG becomes legally obligated to pay.

Applying *Cass Medical Center,* we hold LOCLG, by purchasing the insurance, did not waive its sovereign immunity against Plaintiff's claim. Accordingly, the portion of the judgment awarding Plaintiff $250 actual damages against LOCLG and $2,500 punitive damages against LOCLG must be reversed.

■ This brings us to point II, which avers Beeman "is a public official not subject to tort liability for discretionary acts under the doctrine of official immunity."

Discussion of this point begins by recognizing that while sovereign immunity shields public entities from tort liability, it does not extend to individual public officials who act as agents of a public entity. *Larabee v. City of Kansas City,* 697 S.W.2d 177, 180[3] (Mo.App.1985).

■ Nonetheless, in some circumstances such officials are insulated against tort liability by the doctrine of official immunity. Such immunity depends upon whether the act on which the claim is based was discretionary or ministerial; if discretionary, the official is immune, but if ministerial, he is liable for negligent performance. *Gavan*

6. Rule references are to Missouri Rules of Civil Procedure (1992).

*v. Madison Memorial Hosp.,* 700 S.W.2d 124, 127–28[5] (Mo.App.1985); *Larabee,* 697 S.W.2d at 180[4]; *Smith v. Lewis,* 669 S.W.2d 558, 563[11] (Mo.App.1983); *Oberkramer v. City of Ellisville,* 650 S.W.2d 286, 295[9] (Mo.App.1983).

■ Assuming, without deciding, that Beeman is a public official and therefore eligible for protection by the doctrine of official immunity, we hold such defense fails for two reasons. To explain them, we first set forth Beeman's theory of defense.

Her hypothesis, as we comprehend it from the argument in her brief, is that she and Dirks (on June 23, 1988) were discussing a rumor that some PIC members wanted certain MOCA employees terminated, one of whom was Plaintiff. Dirks testified that if a MOCA employee had sexually propositioned a PIC member, he, as Interim Executive Director of MOCA, would want to know about it. Consequently, argues Beeman, if she gave Dirks her opinion of why some PIC members wanted Plaintiff terminated, it was because Plaintiff's conduct "would have a negative impact on the whole program." Therefore, reasons Beeman, she performed a discretionary act in telling Dirks about Plaintiff.

As to her alleged statements about Plaintiff to Leather and Garnett, Beeman asserts those individuals "had a vested interest in the working relationship between PIC, LOCLG and MOCA." According to Beeman, assuming arguendo that she made the alleged statements, her decision to do so "was a discretionary act on her part in communicating information to persons with a vital interest in the subject matter of the statement."

The first flaw in Beeman's "official immunity" defense is that it is inconsistent with her trial testimony. Asked about the June 23, 1988, meeting, Beeman testified:

Q. Did you tell Chuck Dirks that Lydia Balderree propositioned a [PIC] member?

A. No, I did not.

Q. Did you tell Chuck Dirks that Lydia Balderree had propositioned anybody?

A. No, I did not.

Q. Did you have any conversation with Mr. Dirks at all concerning Lydia Balderree?

No.

As reported earlier, Beeman also testified she did not tell Garnett on March 27, 1988, that Plaintiff had propositioned a PIC member, and she never told Leather that Plaintiff had propositioned a PIC member.

A defendant may not rely on a defense which has been directly repudiated by his own testimony. *Ferguson v. Ginn,* 652 S.W.2d 295, 298[2] (Mo.App.1983); *Clinton v. Staples,* 423 S.W.2d 1, 4[10] (Mo.App. 1967).

Here, Beeman solemnly denied under oath at trial that she made the allegedly slanderous statements. She did not testify she made them in carrying out a discretionary duty as a public official. To the contrary, she avowed to the jury, in sum: "I didn't say it."

Now, on appeal, she pleads that if she made the offending statements, she did so under circumstances cloaking her with official immunity.

In *Johnson v. Rival Mfg. Co.,* 813 S.W.2d 78 (Mo.App.1991), an ex-employee sued her former employer for failure to give her a service letter, § 290.140, RSMo 1986. At trial, the employer contended the employee quit more than a year before requesting such a letter, hence the employer had no duty to send one and could not be held liable for failing to do so. On appeal from a judgment for the employee, the employer maintained a letter it sent the employee met all the requirements of the statute, therefore the trial court should have entered judgment for the employer notwithstanding the verdict. The Western District of this Court held:

Having adopted the theory at trial that it was not giving [the employee] a service letter because her request was untimely, [the employer] will not be heard to contend now that it did give her such a letter. A party is bound by the theory

advanced at trial and may not change that theory on appeal.

813 S.W.2d at 80[1, 2].

At trial, Beeman presented not only her own testimony, but also that of Kelsey and McGarity. An alert reader will recall that both of those witnesses testified they did not hear Beeman say anything about Plaintiff at the June 23, 1988, meeting.

The jury obviously disbelieved Beeman and her witnesses. Now, Beeman asks us to hold that the circumstances under which she made the allegedly slanderous statements bring her within the protection of official immunity.

She cannot have it both ways. She either made the statements or she didn't. At trial, she swore she didn't. She cannot now claim that if she did, she was shielded by official immunity.

█ The second defect in the official immunity defense is that the evidence is insufficient to support a finding that Beeman was performing a discretionary duty when she made the allegedly slanderous statements.

LOCLG's bylaws establish the duties of Executive Director as follows:

Section 6.1 ... The executive director shall be the chief administrative officer of the Council and shall be in charge of and responsible for all professional planning work and of the administration of the functions and offices of the Council.... He shall, with advice and consent of the appropriate committee, make appointments of staff personnel; with approval of the Executive Committee prepare reports, and publications, and direct the work of the staff. The executive director may testify before appropriate public bodies or committees thereof on such policies and recommendations as may be adopted and approved by the Council and may consult and confer with appropriate public officials on behalf of the Council in connection with the program of the Council.

Section 6.2 ... The executive director, with the personnel committee, shall from time to time, recommend to the members the size of the staff required and the composition thereof. Such personnel as are authorized shall be appointed by the executive director with the consent of the personnel committee. Promotions and salaries shall be determined by the Executive Committee which shall receive and consider but shall not be bound by the recommendations of the executive director and the personnel committee....

Commissioner Moore, Chairman of the LOCLG board, testified Beeman's responsibilities were to see that funds were properly requested, documented and disbursed. If an insufficiently documented request was received from MOCA, it was Beeman's responsibility to contact MOCA's executive director and obtain the required documentation. It was not LOCLG's responsibility to evaluate the performance of any MOCA employee, and Beeman had no supervisory responsibility of any MOCA employee.

Beeman admitted the job performance of MOCA employees was none of her business and the only responsibility of a MOCA employee to LOCLG was to provide information about the JTPA programs so LOCLG could report to PIC. Beeman also admitted she had no personal knowledge that Plaintiff ever propositioned a PIC member for sexual favors.

Discretionary decisions of public officials, protection of which is the purpose of the doctrine of official immunity, are those which are a manifest exercise of the sovereign's power—those decisions which go to the essence of governing. *State ex rel. Eli Lilly and Co. v. Gaertner*, 619 S.W.2d 761, 765 (Mo.App.1981).

Beeman's statements that Plaintiff propositioned PIC members were not, in the circumstances under which they were uttered, made by Beeman in the performance of one of her discretionary duties as Executive Director of LOCLG. It was not her responsibility to supervise, evaluate or discipline MOCA employees, nor was it her responsibility to resolve friction between MOCA and PIC. LOCLG was merely the administrative entity for PIC, handling the paper work and filing the required reports.

Furthermore, Beeman admitted she had no personal knowledge that Plaintiff had ever propositioned a PIC member. Telling MOCA, LOCLG and PIC people that Plaintiff had "propositioned" PIC members without knowing it was true does not, under any stretch of imagination, constitute a discretionary official act.

Point II is denied.

■ Point III charges the trial court with error in submitting the issue of punitive damages to the jury and in assessing court costs against Defendants. The point asserts LOCLG is a public entity and Beeman is a public official performing a discretionary act, thus both are entitled to immunity.

We have already held LOCLG is shielded from liability by sovereign immunity and that the award of actual and punitive damages against it must be reversed. The taxing of costs against LOCLG must also be reversed. *State ex rel. School District of the City of Independence v. Jones,* 653 S.W.2d 178, 191[15] (Mo. banc 1983).

However, in denying point II we rejected Beeman's contention that she was shielded from liability by official immunity. Consequently, she cannot invoke that doctrine as a defense against punitive damages or costs.

■ Point IV reads:

The trial court erred in overruling Appellants' motion for direct [sic] verdict in that there was no substantial evidence that Betty Beeman published a defamatory statement.

Rule 84.04(d) reads, in pertinent part:

The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous....

Setting out only abstract statements of law without showing how they are related to any action or ruling of the court is not a compliance with this Rule.

The purpose of the rule and the necessity of obeying it are fully discussed in the leading case of *Thummel v. King,* 570 S.W.2d 679, 684–88 (Mo. banc 1978).

Point IV supplies no hint as to wherein and why the evidence was insufficient to demonstrate Beeman published a defamatory statement. In *Best v. Culhane,* 677 S.W.2d 390 (Mo.App.1984), a point relied on stated "no substantial evidence supports the judgment ... and the judgment is against the weight of the evidence." *Id.* at 394. The Eastern District of this Court held the point preserved nothing for review in that it failed to state wherein and why there was no substantial evidence to support the judgment or wherein and why the judgment was against the weight of the evidence. *Id. Accord: Tripp v. Harryman,* 613 S.W.2d 943, 950[12] (Mo.App. 1981).

Point IV suffers the same fatal defect. It preserves nothing for review and need not be further addressed.

■ Point V reads:

The trial court erred in failing to rule, as a matter of law, that Betty Beeman had a qualified privilege to make the statement, in submitting MAI 23.10(1) instead of 23.10(2), in overruling [Defendants'] motion for directed verdict because [Plaintiff] did not prove actual malice to overcome the defense of qualified privilege by clear and convincing evidence, and in refusing [Defendants'] offer of proof concerning statements made by Ray Cassidy in the presence of [Plaintiff] and Maxine Leather.

The point obviously suffers the same defect as point IV, *viz,* it violates Rule 84.-04(d). The point yields no clue as to wherein and why Beeman had a qualified privilege to make the allegedly slanderous statements, supplies no enlightenment as to why it was error to submit MAI 23.10(1) instead of MAI 23.10(2), furnishes no hint about how Plaintiff's proof failed to overcome the defense of qualified privilege, does not identify the "statements" of Ray Cassidy, and sets forth nothing suggesting how it was error to refuse the offer of proof concerning them.

The import of point V can be divined, if at all, only by seining the argument that follows it. From that source, we deduce Beeman's theory is that given the circumstances under which she made the allegedly slanderous statements, she had a qualified privilege to utter them and cannot be held liable for slander absent clear and convincing evidence of malice. An explanation of qualified privilege appears in *Henry v. Halliburton*, 690 S.W.2d 775, 780–81[8–10] (Mo. banc 1985).

Beeman's effort to assert qualified privilege is thwarted by the same principle that barred her from relying on official immunity. She swore to the jury that she did not make the allegedly defamatory statements. Having so testified, she cannot now argue on appeal that she made them under circumstances whereby she was protected by qualified privilege.

As we fathom the argument under point V, all of the alleged errors mentioned in the point relate to the defense of qualified privilege. Inasmuch as Beeman's trial testimony precludes her from asserting such defense on appeal, point V would provide no basis for reversal even if it complied with Rule 84.04(d).

■ Point VI assigns error as to instructions 7 and 12. Instruction 7 was Plaintiff's verdict director against Beeman; instruction 12 was Plaintiff's verdict director against LOCLG. Both were patterned on MAI 23.10(1) [1980 New]. While the attack on each instruction is identical, we shall consider the attack on instruction 7 only. Because we have already held the judgment must be reversed as to LOCLG, the complaint about instruction 12 is moot.

Beeman launches her attack on instruction 7 by asserting the allegedly slanderous statements "did not constitute slander per se." In *Smith v. UAW–CIO Federal Credit Union*, 728 S.W.2d 679, 682[2] (Mo.App. 1987), the Western District of this Court held slander is actionable per se if it falsely imputes to the plaintiff (1) the commission of a criminal offense, (2) a loathsome disease, (3) a matter incompatible with his business, trade, profession or office, or (4) serious sexual misconduct. If a plaintiff pleads and proves slander per se, he need not prove actual damages as a prerequisite for recovery, as the law presumes injury. *Brown v. Kitterman*, 443 S.W.2d 146, 149, 153 (Mo.1969); *Smith*, 728 S.W.2d at 683[3]; *Hunt v. Gerlemann*, 581 S.W.2d 913, 914[2] (Mo.App.1979).

Beeman's claim of error, as we comprehend it, is that (1) the allegedly slanderous statements were not slanderous per se, and (2) Plaintiff failed to prove she suffered actual damage. Consequently, reasons Beeman, the trial court erred in giving instruction 7.[7]

As authority for her premise that the allegedly defamatory statements were not slanderous per se, Beeman directs us to this passage from *Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385, 388–89 (Mo.1963):

> In determining whether language is libelous per se, it must be viewed stripped of any pleaded innuendo. The meaning of the phrase "per se" is "taken alone, in itself, by itself." Words which are libelous per se do not need an innuendo, and, conversely, words which need an innuendo are not libelous per se.

However, from *Hunt*, 581 S.W.2d at 915, we learn:

> The accusation need not be direct, but if not, it must be the only inference that could be reasonably drawn from the lan-

---

7. Instruction 7 read:

> Your verdict must be for plaintiff if you believe:
> First, defendant Betty Beeman stated that "plaintiff propositioned two members of the Private Industry Council ('PIC')," and
> Second, defendant Betty Beeman was at fault in making such statement, and
> Third, such statement tended to expose plaintiff to ridicule, embarrassment, humiliation and mental anguish, and

> Fourth, such statement was heard by Mr. Chuck Dirks, Mr. Bob Garnett, and Mrs. Maxine Leather; and
> Fifth, plaintiff's reputation was thereby damaged, unless you believe plaintiff is not entitled to recover by reason of Instruction No. 9.

Instruction 9, given at the behest of Beeman, read: "Your verdict must be for defendant Betty Beeman if you believe that the statement that plaintiff had propositioned a member or members of the [PIC] was substantially true."

guage used.... The words, although not required to be uttered with precision, must be naturally and presumably understood by third parties to constitute an allegation [imputing to the plaintiff one of the acts or conditions constituting slander per se].

Beeman argues: "Since the term 'proposition' is capable of more than one meaning, it is not defamatory without the aid of extrinsic proof or innuendo."

Depending on the context, the word "proposition" may be either a noun or verb. As a verb, it is defined:

to make a proposal to: offer a scheme to; *specif:* to suggest sexual intercourse to

*Webster's Third New International Dictionary* 1819 (Merriam–Webster Inc., 1986).

Earlier in this opinion we set forth the testimony of witnesses Dirks, Garnett and Leather wherein they quoted Beeman's statements about Plaintiff. It is obvious that in the context of her statements, Beeman used the term "propositioned" as a verb. Dirks testified he understood Beeman's statements as meaning a sexual proposition, and it is inferable from the testimony of Garnett and Leather that they likewise understood Beeman's statements as meaning a sexual proposition.

We hold that in context, the only reasonable inference from Beeman's statements was that Plaintiff had made sexual propositions to PIC members. Any other holding would ignore today's vernacular.

As observed earlier, a statement falsely imputing to the plaintiff a matter incompatible with his business, trade, profession or office is slanderous per se. *Brown* explains:

As a general rule, false words which tend to prejudice the person spoken of in his ... office, occupation, or employment, are actionable without proof of special damages if they affect him in such calling in a manner that may, as a necessary consequence, ... prevent him from deriving therefrom that pecuniary reward which, probably he might have obtained.... The words must impute "a want of ... fitness to perform or dis-

charge the duties" of a profession, trade, business or employment ... or, stated another way, to be actionable per se the words must be defamatory of the plaintiff in such calling in that they impute ... want of integrity or misconduct in the line of his calling.

443 S.W.2d at 154[10].

Plaintiff points out that her employer, MOCA, had a contract with PIC as a JTPA program operator. It was Plaintiff's job to contact prospective employers, explain the programs, and encourage the employers to participate in them by hiring unemployed people. According to Plaintiff, statements that she propositioned PIC members imply she was endeavoring, by offer of sexual favors, to influence members of the entity that did business with her employer. Such behavior imputes misconduct and lack of integrity by Plaintiff in her occupation. Because her job involved contacting potential employers and recruiting them in JTPA programs, it was essential that she not be branded as a woman willing to barter sexual favors for business gains. Indeed, Defendants' brief acknowledges that "any such activities by [Plaintiff] would have a negative impact on the whole program."

On this subject, Plaintiff testified David Jeffries was the supervisor of the Lebanon office of the Division of Employment Security and also a member and officer of PIC. Plaintiff recounted:

... when I worked in Lebanon ... he used to come over several times a week and talk about different programs that we were running. And after this time frame [when I learned about Beeman's statements to Dirks of June 23, 1988], and I don't remember that it was immediately after, but in that time frame he stopped coming over; didn't come over at all. And then when I would see him outside of the office, he would act like he didn't see me. And he has never since then spoke to me.

We hold the allegedly defamatory statements are slanderous per se in that they impute to Plaintiff misconduct and lack of integrity in her occupation, bespeaking un-

fitness to perform it. Having decided that, we need not consider whether (as argued by Plaintiff) the statements impute serious sexual misconduct.

Inasmuch as the statements constitute slander per se, it was unnecessary for Plaintiff to prove actual damage. Accordingly, in giving instruction 7 the trial court did not err in any respect assigned in Point VI.

█ Point VII reads:

The trial court erred in overruling [Defendants'] motion for directed verdict submitting Instructions No. 7 and No. 12 because there was not substantial evidence that Betty Beeman's statement tended to expose [Plaintiff] to ridicule, embarrassment, humiliation and mental anguish, no evidence that [Plaintiff's] reputation had been damaged, and no evidence that statements made to Maxine Leather and Donald Garnett caused [Plaintiff] any damage.

While this point arguably suffers the same deficiencies that doomed points IV and V, we shall address it on the merits, restricting our attention to instruction 7 because, as explained in our discussion of point VI, any complaint about instruction 12 is moot.

We first consider Beeman's complaint that there was no substantial evidence that the slanderous statements tended to expose Plaintiff to ridicule, embarrassment, humiliation and mental anguish as submitted in instruction 7.[8] We have scrutinized the record of the instruction conference, Rule 70.02(a), and have found no remark by Beeman registering that complaint.

Although objections to instructions at trial are not required to preserve claims of error, Rule 70.03, failure to raise the issue may be considered in determining whether an erroneous instruction is prejudicial. *Cornell v. Texaco, Inc.*, 712 S.W.2d 680, 682[5] (Mo. banc 1986). If a defect is not apparent to alert counsel preparing to argue the case, it is unlikely the jury will be confused or misled. *Id.; Hudson v. Carr*, 668 S.W.2d 68, 72 (Mo. banc 1984).

Furthermore, during the instruction conference Beeman tendered an instruction marked by the trial court as "Instruction No. DA." Beeman told the trial court the instruction was "the appropriate verdict directing instruction." Paragraph "Fourth" of the instruction hypothesized Beeman's statements "tended to expose plaintiff to ridicule, embarrassment, humiliation and mental anguish."

A party is bound on appeal by the position taken in the trial court. *Williams v. St. Louis Public Service Co.*, 363 Mo. 625, 253 S.W.2d 97, 104[9] (banc 1952); *Douglas v. Farrow*, 334 S.W.2d 234, 240[6] (Mo. 1960). Having tendered to the trial court an instruction containing the very language about which she now seeks to complain, Beeman is barred from asserting the alleged error. Her first attack on instruction 7 in point VII presents no basis for reversal.

█ Point VII's second attack on instruction 7 is that there was no evidence that Plaintiff's reputation had been damaged.

We disagree. Witness Leather testified the rumors she heard about Plaintiff from Beeman were discussed by LOCLG staff members. Leather did not believe the rumors; so far as she was concerned, Plaintiff's reputation was not tarnished. However, added Leather, because of the rumors, "My heart felt for her." Viewed favorably to the verdicts, it is reasonably inferable from this comment that Leather perceived a decline in Plaintiff's reputation with others.

Furthermore, there was evidence that around Christmas, 1988, David Jeffries (mentioned in our discussion of point VI) said, "Watch out for Lydia." Given the evidence that he ceased business contacts with Plaintiff, this comment, viewed favorably to the verdicts, indicates Plaintiff's reputation became such that Jeffries was wary of her.

Finally, because Beeman's statements about Plaintiff were slanderous per se,

---

**8.** Footnote 7, *supra*.

Plaintiff was not required to prove actual damage. We hold reversal is not warranted for any of the complaints in point VII.

Point VIII reads:

The trial court erred in overruling [Defendants'] motion for new trial in that Instructions No. 7 and No. 12 were improper in form as required by MAI and constitutionally inadequate in that they failed to require a finding by the jury that the allegedly slanderous statements were false and they improperly instructed the jury on the elements of slander, more particularly, reputational [sic] damage.

The point makes a triple attack on instructions 7 and 12. First, it asserts they "were improper in form as required by MAI." The point furnishes no hint as to wherein and why the form of the instructions ran afoul of MAI. For the reasons set forth in our discussion of points IV and V, we hold this attack presents nothing for review.

The third attack in point VIII states instructions 7 and 12 "improperly instructed the jury on the elements of slander, more particularly, reputational [sic] damage." The point provides no clue as to wherein and why the instructions improperly instructed the jury on those subjects. For the reasons given in our discussion of points IV and V, we hold this attack likewise presents nothing for review.

■ The second attack on instructions 7 and 12 in point VIII is based on *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Because, as noted earlier, any complaint about instruction 12 is moot, we shall consider the second attack as to instruction 7 only.

*Hepps* holds that the common law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for "speech of public concern." 475 U.S. at

776–77, 106 S.Ct. at 1564. Therefore, where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages without showing that the statements are false and the media defendant was at fault in publishing them. 475 U.S. at 768–69, 106 S.Ct. at 1559.

Here, instruction 7 [9] tracked MAI 23.-10(1) [1980 New]. It required the jury to find Beeman was at fault in making the slanderous statements, but did not require the jury to find the statements were false. Instruction 9 [10] (tracking MAI 32.12 [1969 New]) told the jurors their verdict must be for Beeman if they believed the slanderous statements were substantially true.

Beeman does not contend (a) she is a media defendant, (b) Plaintiff is anyone other than a private-figure plaintiff, or (c) the slanderous statements were speech of public concern. Consequently, the instant case is not governed by *Hepps*.

Rule 70.02(b) requires that whenever MAI contains an instruction applicable in a particular case, it shall be given to the exclusion of any other on the same subject. *Joseph v. Elam*, 709 S.W.2d 517, 524 (Mo. App.1986). Here, MAI 23.10(1) [1980 New] was the applicable instruction.

Furthermore, in submitting the issue of damages against Beeman, the trial court, in instruction 10 (MAI 4.15 [1980 New]) told the jury:

If you find the issues in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe she sustained and is reasonably certain to sustain in the future as a direct result of the making of the statement mentioned in the evidence.

If you find the issues in favor of plaintiff, and if you believe that defendant Beeman made the statement with knowledge that it was false or with reckless disregard for whether it was true or false at a time when defendant Beeman

---

**9.** Footnote 7, *supra.*

**10.** Footnote 7, *supra.*

had serious doubts as to whether it was true, then in addition to any damages to which you find plaintiff entitled under the foregoing paragraph, you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and deter her and others from like conduct.

As reported in the second paragraph of this opinion, the jury assessed actual and punitive damages against Beeman. Presumably, in assessing punitive damages the jury found, as submitted in instruction 10, that Beeman made the slanderous statements with knowledge they were false or with reckless disregard for whether they were true or false at a time when she had serious doubts as to their truth. Consequently, even if instruction 7 should have hypothesized the slanderous statements were false, such omission was cured by instruction 10 and the jury's finding of malice implicit in its award of punitive damages. *Cf. Carter v. Willert Home Products, Inc.,* 714 S.W.2d 506, 513–14[7] (Mo. banc 1986).

For the above reasons, there is no merit in Beeman's second attack on instruction 7 in point VIII.

The portions of the judgment awarding Plaintiff actual damages, punitive damages, interest and costs against LOCLG are reversed. In all other respects, the judgment is affirmed.

PREWITT, P.J., and PARRISH, J., concur.